```
 1              IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2

 3

 4    4DD HOLDINGS, LLC,                    )

 5             Plaintiff,                   ) Case No.

 6                  vs.                     ) 15-945C

 7    THE UNITED STATES OF AMERICA,         )

 8             Defendant.                   )

 9

10

11                        Courtroom 9

12          Howard T. Markey National Courts Building

13               717 Madison Place, N.W.

14                    Washington, D.C.

15              Wednesday, August 9, 2017

16                       1:30 p.m.

17                    Status Conference

18

19

20         BEFORE: THE HONORABLE ERIC G. BRUGGINK

21

22

23

24

25    Elizabeth M. Farrell, CERT, Digital Transcriptionist
```

4DD Holdings, LLC v. USA                                    8/9/2017

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3           EDWARD H. MEYERS, ESQ.

 4           ROBERT B. GILMORE, ESQ.

 5           PAT A. CIPOLLONE, ESQ.

 6           Stein, Mitchell, Cipollone Beato & Missner LLP

 7           1100 Connecticut Avenue, NW

 8           Suite 1100

 9           Washington, D.C. 20036

10           (202) 737-7777 / (202) 296-8312 (fax)

11           emeyers@steinmitchell.com

12

13

14

15   ON BEHALF OF THE DEFENDANT:

16           JOHN J. TODOR, ESQ.

17           U.S. Department of Justice - Civil Division

18           Post Office Box 480

19           Ben Franklin Station

20           Washington, DC 20044

21           (202) 616-2382 / (202) 514-8640 (fax)

22           john.todor@usdoj.gov

23

24

25
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

4DD Holdings, LLC v. USA                                    8/9/2017

```
 1    APPEARANCES (cont'd.):
 2    ON BEHALF OF THIRD PARTY DEFENDANT (KSJ):
 3              CHRISTINA HEISCHMIDT, ESQ.
 4              Dunlap Bennett & Ludwig
 5              8300 Boone Blvd.
 6              Suite 550
 7              Vienna, Virginia 22182
 8              (703) 442-3890 / (703) 777-3656 (fax)
 9              cheischmidt@dbllawyers.com
10
11
12    ON BEHALF OF THIRD PARTY DEFENDANT (IMMIX):
13              No representative present
14
15
16
17
18
19
20
21
22
23
24
25
```

4

4DD Holdings, LLC v. USA                                    8/9/2017

```
 1                  P R O C E E D I N G S
 2                    -   -   -   -   -
 3              (Proceedings start mid-sentence, 1:30 p.m.)
 4              MR. GILMORE:  -- Pat Cipollone and Robert
 5     Gilmore.
 6              THE COURT:  Okay.
 7              MR. CIPOLLONE:  Good afternoon, Your Honor.
 8              THE COURT:  Good afternoon.
 9              And for the Government?
10              MR. TODOR:  John Todor, Department of Justice,
11     for the United States.
12              THE COURT:  Okay.
13              MS. HEISCHMIDT:  And Christina Heischmidt for
14     KSJ.
15              THE COURT:  All right, thank you.
16              Well, why don't you all stay there since this
17     is not an argument.  I assume we can do this back and
18     forth.
19              Mr. Meyers, do you want to sort of give me an
20     update on where things stand?
21              MR. MEYERS:  Rob?
22              THE COURT:  Oh, I'm sorry.  Who do I need to be
23     asking?
24              MR. MEYERS:  Mr. Gilmore is going to --
25              THE COURT:  All right, that's fine.
```

4DD Holdings, LLC v. USA                                      8/9/2017

```
1              MR. MEYERS:  Sorry.
2              MR. GILMORE:  Would you like me to stand, Your
3    Honor?
4              THE COURT:  No, just keep your seat.  That's
5    fine.
6              MR. GILMORE:  Sure.  Thank you, Your Honor.
7    Perhaps since Ms. Heischmidt is here, we can address the
8    KSJ subpoena.  I think there we have good news, I
9    believe.  Obviously, Ms. Heischmidt can jump in.  But
10   we've had exchanges the past couple of days, and as I
11   understand it, KSJ will begin the process of producing
12   documents in response to our subpoena based on a
13   communication from the Government that the Government's
14   position is they can do so for producing documents
15   responsive to our subpoena that are subject to the
16   protective order in our case.
17             And I understand there is an agreement that if
18   KSJ, in doing so, identifies a document that it believes
19   may require additional protection beyond what the
20   protective order provides, that they can raise that
21   document with the Government and the Government will
22   provide a prompt response as to whether that document, if
23   such a document exists, requires some additional
24   treatment.
25             But outside of that, we understand that they
```

4DD Holdings, LLC v. USA                                    8/9/2017

1    are in the process of beginning to review and produce

2    documents and, hopefully, in the next couple weeks, we'll

3    start receiving the tranche of documents from KSJ.

4              THE COURT:  Okay, good.  Remind me, there was a

5    motion to quash.

6              MS. HEISCHMIDT:  That was dismissed without

7    prejudice, Your Honor.

8              THE COURT:  Oh, I already did.

9              MS. HEISCHMIDT:  Yes.

10             THE COURT:  Who is -- who has the

11   confidentiality concern there?  Is that ultimately the

12   Government's concern?

13             MS. HEISCHMIDT:  No, Your Honor, that's KSJ --

14   well, in some way, just not necessarily Mr. Todor.  Our

15   clients are concerned that the confidentiality clauses of

16   each contract with the different departments and agencies

17   could be breached by disseminating the information.

18   However, I think after a review and discussing with other

19   counsel, my client's fears were assuaged a little bit

20   and --

21             THE COURT:  A little bit?

22             MS. HEISCHMIDT:  -- under the protective order,

23   they're able to produce, giving notice to the agencies,

24   that is.

25             THE COURT:  Who's giving notice of what?

4DD Holdings, LLC v. USA                                    8/9/2017

```
 1              MS. HEISCHMIDT:  My client, KSJ, will be giving
 2    notice that their -- well, they already have given notice
 3    and haven't received any -- you know, any response either
 4    way.
 5              THE COURT:  And so what's the notice?  Is it
 6    particular to documents?
 7              MS. HEISCHMIDT:  It's particular that there is
 8    an existing subpoena and they sent the subpoena to the
 9    contracting officers that were affected by this, just
10    noting that there is the subpoena out there and that they
11    need to produce subject to a certain protective order and
12    to let them know if there was any sort of issue that they
13    foresaw --
14              THE COURT:  Mm-hmm.
15              MS. HEISCHMIDT:  -- in actually producing those
16    documents based on the contract that they had.
17              THE COURT:  Is there a deadline for that?
18              MS. HEISCHMIDT:  No, no, Your Honor.  It was a
19    few months ago that they sent out that email and have
20    received no response.  So they were planning on sending
21    another notice, just letting them know that based on
22    negotiations, they would be ready to produce.  So, I can
23    follow up with my clients and certainly say to set a
24    deadline.
25              THE COURT:  Well, let's see if we need to.
```

4DD Holdings, LLC v. USA                                    8/9/2017

1          What's -- Mr. Todor, what's going on with

2      that?

3          MR. TODOR:  I haven't received any of the

4      emails that KSJ's counsel was just talking about.  What I

5      did do was we were corresponding with Plaintiffs for

6      discovery matters, I sent an email stating that our

7      position was that contractors can comply with their

8      nondisclosure agreements with the Government by producing

9      documents that are responsive to the subpoena and making

10     the confidentiality designations called for by the

11     protective order.  We also said --

12         THE COURT:  Hang on a second.  I'm sorry.  Who

13     does that notice go to?  I thought you said the agency.

14         MS. HEISCHMIDT:  The agencies, yes, Your Honor.

15         THE COURT:  We're talking about the agencies

16     that you're representing here?

17         MR. TODOR:  I'm counsel for the United States,

18     so I guess I'm everything.  But with respect to who we've

19     been dealing with in the case, it's been the Department

20     of Defense, Defense Health Agency has been the agency of

21     the Government that I've been dealing with.  I don't know

22     what all agencies KSJ is under contract with or who

23     they're under subcontract with, and I haven't received

24     the emails KSJ's counsel just referred to.  But I did say

25     that, you know, it was our position that they could

4DD Holdings, LLC v. USA                           8/9/2017

1    comply with their obligations with the Government under

2    nondisclosure agreements by making the appropriate

3    designations under the protective order.

4              THE COURT:  Okay.  So those documents would be

5    produced by you eventually and they're all subject to the

6    protective order.  Is that right?

7              MS. HEISCHMIDT:  All the documents that are

8    responsive to the subpoena and that would fall under the

9    protective order would be produced and then we would

10   identify -- we don't believe that there are any other

11   ones.  However, if we feel that there is something beyond

12   the protective order, we would identify that with both

13   counsel and then amend if needed.

14             THE COURT:  All right.  So you did not give Mr.

15   Todor the email request that went to the agencies?

16             MS. HEISCHMIDT:  I do not believe so.  We did

17   send a list of the contracting officers and the different

18   agencies as well as the contracts themselves.

19             THE COURT:  Well, go ahead and print out -- or

20   email him another copy of that.

21             MS. HEISCHMIDT:  Sure.

22             THE COURT:  How do we light a fire under the

23   agencies here?  I guess that's to Mr. Todor.

24             MR. TODOR:  Okay.  Well, I'm -- I was un -- I

25   didn't think that there was any obligation for the agency

4DD Holdings, LLC v. USA                                    8/9/2017

1    to give an affirmative go-ahead once the Court had

2    entered the protective order and, you know, got the

3    position of the Government.  Is that the case?

4              THE COURT:  How is the email phrased?

5              MR. TODOR:  Is that your understanding,

6    Counsel?

7              THE COURT:  If we don't hear from you, we're

8    going to supply these on X date?

9              MR. TODOR:  Your Honor, I would have to double-

10   check with that.  It's been a while since it was sent

11   out.  So, unfortunately --

12             THE COURT:  Well, if it doesn't say that, then

13   send it again --

14             MS. HEISCHMIDT:  Okay.

15             THE COURT:  -- and say the Court ordered us to

16   say that if we don't hear from you within a week --

17             MS. HEISCHMIDT:  Okay.

18             THE COURT:  -- that we're going to furnish

19   these documents.

20             MS. HEISCHMIDT:  Will do.

21             THE COURT:  All right.  Any reason not to do

22   that?

23             MR. TODOR:  None from the Government's

24   perspective.  We would also clarify that -- as we said in

25   our email, we don't know whether KSJ is dealing with any

4DD Holdings, LLC v. USA                                    8/9/2017

1    security clearance type information under any of their

2    contracts that would require secret or top secret

3    clearance, for example.  It was our understanding that

4    the protective order didn't apply to those kinds of

5    documents and those were the kinds of documents that

6    would require the -- if there are any -- if there are any

7    such documents on the part of KSJ.

8            THE COURT:  Well, I'm not trying to make more

9    work for you, but I'm kind of surprised that you're not

10   riding herd on that process.

11           MR. TODOR:  Well, what we received from KSJ

12   within the past week was an email stating the names of, I

13   think, three or four government contracting officers, and

14   then there were seven other companies for which they're a

15   subcontractor, didn't list who the government contact

16   was, listed a private contact with the -- I guess the

17   prime contractor.

18           So I'm not sure who exactly we would be even in

19   contact with on those.  It's my understanding, when I

20   sent the email, that, you know, I said, okay, this is

21   what we think makes it compliant with your nondisclosure

22   agreement with the Government, and at least my

23   understanding from KSJ and 4DD is that they're in

24   agreement with that.

25           THE COURT:  Well, you raise a different

12

4DD Holdings, LLC v. USA                              8/9/2017

 1   question, whether or not who -- who has the interest in
 2   making sure that security clearances issues or top secret
 3   matters don't go out the door accidentally?
 4            MR. TODOR:  The Government does.
 5            THE COURT:  Right.  And so that's why I'm a
 6   little surprised that the Government hasn't taken a more
 7   direct role in trying to figure out what these agencies
 8   are being asked to allow.  Well, one way or the other, go
 9   ahead and send that additional email.
10            MS. HEISCHMIDT:  Yes, sir.
11            THE COURT:  But make it self-executing, so that
12   if you don't hear back (inaudible).
13            MS. HEISCHMIDT:  Okay.
14            THE COURT:  And so you're telling me that KSJ
15   would look for such things as things labeled top secret
16   or security clearance or whatever is required?
17            MS. HEISCHMIDT:  Yes.  Yes, Your Honor.
18            THE COURT:  Okay.  I'm trying to recall what
19   else was sort of up in the air the last time we met or
20   talked.
21            MR. GILMORE:  Well, Your Honor, the number --
22   the question of the number of copies of the TETRA
23   software --
24            THE COURT:  Mm-hmm.
25            MR. GILMORE:  -- is something that we discussed

1   on the July 21st telephonic conference call with you, and

2   I know, looking at transcripts from prior hearings, it's

3   obviously something that Your Honor has raised and it's

4   an important issue.

5           THE COURT:  Well, hang on -- oh, okay.  I

6   didn't raise it on my own.  I'm assuming the Plaintiff

7   wants that information.

8           MR. GILMORE:  You've asked the parties where

9   are you on that.

10          THE COURT:  Right.

11          MR. GILMORE:  And you're absolutely right to

12  identify it.  It's an important issue.  It's something

13  that we've been pushing for and we've pushed further on

14  it and we've asked the Government to give us an answer.

15  And in the interrogatory answers, they have declined to

16  do that.  We've said -- well, we're going to proceed to

17  take David Calvin's deposition.

18          THE COURT:  Who is he?

19          MR. GILMORE:  He is the chief engineer and

20  project manager for the DMIX project.  He submitted -- he

21  partially verified the Government's interrogatory

22  responses and then submitted two declarations that

23  purport to supplement or amend the Government's position

24  on the number of installs.  We don't think that those

25  declarations are accurate.  And so while we've asked for

4DD Holdings, LLC v. USA                                    8/9/2017

1    his deposition -- and I learned this morning we're

2    apparently -- it looks like Mr. Todor is going to be

3    offering him on August 29th, which is good because we

4    need answers from him.  But we still think that the

5    Government needs to provide accurate and complete answers

6    to the interrogatories and --

7              THE COURT:  To what extent is that going to be

8    disclosed, for lack of a better word, by when Ms.

9    Heischmidt furnishes her material?

10             MR. GILMORE:  Well, it's a good question, Your

11   Honor.  We're looking at the case schedule and,

12   obviously, in a perfect world, we would have all the

13   documents from everyone before we take depositions of key

14   witnesses.  But because we don't feel we have a straight

15   answer, we decided that we need to move forward with Mr.

16   Calvin's deposition now.

17             We have asked the Justice Department to confirm

18   that they've produced all of Mr. Calvin's documents and

19   we haven't gotten that confirmation back.  Maybe Mr.

20   Todor can share with us that.  In particular, we've

21   identified that there are -- he's produced -- he used his

22   personal email accounts for business, and we see that in

23   some of these documents and we want assurances that all

24   of those personal email accounts' emails that are

25   relevant to this case have been collected and produced --

4DD Holdings, LLC v. USA                          8/9/2017

```
 1                 THE COURT:  He's not a 30(b)(6)?
 2                 MR. GILMORE:  We have not noticed him as a
 3    30(b)(6).  But since he is someone who verified the
 4    interrogatory responses and claims direct personal
 5    knowledge, we think that -- we need to test the
 6    assertions in his declarations.
 7                 THE COURT:  All right, today is the 11th.  If
 8    you furnish the materials -- are you ready to turn over
 9    things, I presume, in one batch or do you have to do this
10    on a rolling basis?
11                 MS. HEISCHMIDT:  Unfortunately, Your Honor, I
12    think it would be on a rolling basis.
13                 THE COURT:  Why is that?
14                 MS. HEISCHMIDT:  So KSJ is not a very large
15    company and so they're -- and also they have never
16    experienced litigation before.  And so --
17                 THE COURT:  It's fun, isn't it?
18                 MS. HEISCHMIDT:  -- they are -- so I think that
19    they're a little bit overwhelmed, and I have to guide
20    them specifically as to how to do these searches and to
21    pull these items, which they're doing well for, but I
22    think they have to --
23                 THE COURT:  So the email you sent to the
24    different agencies is generic in the sense that we're
25    about to produce the following types of information?
```

4DD Holdings, LLC v. USA                                    8/9/2017

1           MS. HEISCHMIDT:  It was a copy of the subpoena.

2    It was a blind -- I believe it was a blind sent email

3    saying that if you're on this email essentially, you're a

4    contract that we've identified had certain hits and have

5    information that will be falling under the subpoena that

6    need to be produced.  And so --

7           THE COURT:  Well, so you don't have --

8           MS. HEISCHMIDT:  And, again, I don't remember

9    the --

10          THE COURT:  -- in your hand materials that are

11   responsive?

12          MS. HEISCHMIDT:  They have hits.  That's what I

13   understand.  I don't know if they have pulled them.  I

14   think they still need to review to confirm that

15   everything is relevant, but that also falls under the

16   protective order.  So there's -- I think there's two

17   steps.

18          THE COURT:  Well, there's not any problem with

19   your client going through that now, is it?

20          MS. HEISCHMIDT:  No.  They're starting on that,

21   absolutely.

22          THE COURT:  Yeah.  Well, my suggestion would be

23   in order to make the August 29th depositions as useful as

24   possible, to try to get as much to the Plaintiff as

25   possible before then.

```
 1              MS. HEISCHMIDT:  Yes, Your Honor.
 2              THE COURT:  Well, if it turns out -- well,
 3     first of all, let's deal with personal emails.  Are you
 4     satisfied that he's gone through his personal emails?
 5              MR. TODOR:  Yes, and I emailed Plaintiff's
 6     previous counsel on May 3rd that each of the five initial
 7     email custodians that Plaintiffs identified, which Mr.
 8     Calvin was one, had confirmed that all responsive
 9     documents sent to their personal requests -- personal
10     email accounts, if any, have already been produced to DOJ
11     for inclusion in our response to Plaintiff's first
12     request for production of documents.
13              THE COURT:  Okay.  And remind me what his role
14     was.
15              MR. TODOR:  His -- well, he's had a couple
16     different positions.  He's currently Director of
17     Standards and Technology for the Department of Defense,
18     Interagency Program Office, from May '13 to March 2015,
19     which was basically the relevant time in the case.  He
20     was the program manager for DMIX, chief engineer, and his
21     responsibilities included architecture, security, system
22     development and contractor office representative for the
23     Systems Made Simple, SMS, which is another contractor
24     involved in this case, support contract.
25              THE COURT:  Well, I'm just going to assume for
```

1    the time being, as you have, too, that you've gotten

2    everything that's responsive.  If that turns out not to

3    be the case after the deposition, then redeposing him

4    would be on the Government's nickel.

5              MR. GILMORE:  Understood, Your Honor.  And I

6    think the one question -- this is a category that comes

7    up often in discovery -- is, as I understand it, the

8    Government is still in the process of putting together

9    its privilege log.  But if there are a set of Dave Calvin

10   documents for which they're still in the process of

11   assessing whether they're privileged and those might

12   potentially be depriv'ed and produced, perhaps if the

13   Government can sort of accelerate that and complete that

14   process with respect to him in the next week, so that if

15   we have any, you know, initially privileged documents

16   that the Government, on further review, decided, no, it's

17   not privileged, we're going to produce it, I think those

18   could be, and often are, important documents in cases.

19   So we want to make sure that happens at least before this

20   deposition occurs.

21             THE COURT:  When did you first notice his

22   deposition?

23             MR. GILMORE:  Well, we noticed his deposition

24   last week for August 23rd.  We learned yesterday or --

25   I'm sorry -- Monday, that he wasn't available on the

4DD Holdings, LLC v. USA                                    8/9/2017

1    23rd, and Mr. Todor told me this morning -- this

2    afternoon, right before this hearing, that it's likely

3    that he would be able to sit for a deposition on August

4    29th.

5              THE COURT:  So but that was the first effort to

6    negotiate an appearance at a deposition by him?

7              MR. GILMORE:  Yes.

8              THE COURT:  All right.  How likely is it that

9    there are going to be documents that are withheld as

10   privileged?

11             MR. TODOR:  Right now, our privilege log --

12   we've completed our initial draft of that and it's in

13   internal review.  There were a small number of documents

14   where we were going to produce them with redactions

15   rather than withholding them in their entirety.  We'll

16   make every effort to get those to Plaintiffs before Mr.

17   Calvin's deposition.

18             THE COURT:  Okay.  And then what?  What's the

19   next step?

20             MR. GILMORE:  Well, we think that the

21   Government should amend its interrogatory responses to

22   address the questions that we've raised before.

23             THE COURT:  Well, I'm sorry, you mentioned that

24   earlier.  I guess I was assuming that this deposition is

25   going to shed light on whether or not those interrogatory

4DD Holdings, LLC v. USA                                    8/9/2017

```
 1   answers are accurate.

 2            MR. GILMORE:  That's our intent, Your Honor.  I

 3   mean, the Government repeatedly seems to be staking its

 4   position out that in terms of the counts, the only count

 5   that they're willing to identify is the number that it --

 6   as the Government claims, were deemed to be overinstalls

 7   as part of this true-up process in late 2014 and early

 8   2015, which led to a contract modification.

 9            But the reason why we filed suit is that we

10   subsequently discovered what we believed was additional

11   project information that showed that there were many more

12   copies than what the Government had indicated during the

13   true-up process.  And we've -- prior counsel, and since

14   we've come on, we've discussed with opposing counsel,

15   with the Government, this issue that there are documents

16   that show deletions of TETRA, which is difficult to

17   square with the Government deciding, well, we're going

18   to pay for copies of TETRA, change orders indicating

19   TETRA needs to be removed from these systems.  Why would

20   the Government be doing that if the number is known and

21   the Government is paying for it and it's a very small

22   number?

23            We also have learned that the main development

24   testing center, the Richmond DTC, was decommissioned in

25   2015, and we have heard -- we filed suit in August of
```

1    2015, 4DD filed suit in August of 2015.  Mr. Todor, in

2    our last conversation, indicated all he knows as of now

3    was that that occurred in the summer of 2015.  We've

4    actually seen indications that it may have occurred in

5    October of 2015, which obviously would be two months

6    after we filed suit and would raise questions of whether

7    proper evidence preservation measures had been

8    eliminated.

9         All of these issues raise the question of there

10   is evidence that there were more copies than the true-up

11   number and, yet, the Government continues to stick with

12   the true-up number as the only number that it is willing

13   to provide us.

14        When we read Mr. Calvin's second declaration,

15   he discusses the process by which copies of TETRA would

16   be made and moved, but it doesn't appear to us that the

17   Government is willing to investigate and tell us what it

18   thinks the number is.  So we're moving forward with this

19   deposition.  We will learn, I suspect, a fair amount more

20   about this.

21        And then I think that we may well need to -- we

22   may seek additional relief.  We need to figure out what,

23   based on Mr. Calvin's testimony, what the truth is on

24   these numbers and what the Government should be putting

25   in an accurate litigation position statement just in

4DD Holdings, LLC v. USA                                      8/9/2017

1    response to our discovery request.

2              THE COURT:   Is the Government's position that

3    the current answers are accurate or that the Plaintiff is

4    not entitled to more information for some legal reason?

5              MR. TODOR:   Our position is that our current

6    answers are accurate and the answer we gave them was --

7    they asked how many copies total.  Our answer was 232

8    cores, which was the number that was agreed upon and for

9    which 4DD was paid.  Its authorized reseller executed a

10   release in this true-up process back in March of 2015.

11   The documents that the Plaintiffs referred to, there were

12   some change orders issued later, starting September 14,

13   which were copies of -- there's one working copy of TETRA

14   in the DTC facility.  There are copies of them which were

15   not functional.  Those were discussed in the previous

16   status conference.  I think the Court referred to them as

17   "partial installs."

18             We gave a declaration from Mr. Calvin May 3rd

19   of this year explaining what was known about them, and

20   that was in agreement with prior Plaintiff's counsel

21   where they were asking for us to amend our

22   interrogatories, and we said, well, we think our

23   interrogatories are correct because you're asking how

24   many installations of the software.  We don't think this

25   is an installation of the software.  It is a copy,

4DD Holdings, LLC v. USA                                    8/9/2017

1     something that, you know, wasn't itself functional.  But

2     here's a declaration.  That was, you know, the agreement

3     we had with them.  They didn't move to -- for further

4     relief after we did that.  Then they got new lawyers.

5                 THE COURT:  Copies --

6                 MR. TODOR:  But we gave them the information we

7     had.

8                 THE COURT:  Hold on a second.  How do you treat

9     copies?  I'm not sure what you mean by "copies."

10                MR. TODOR:  Okay.  So the explanation was, you

11    know, Mr. Calvin's declaration which, you know, he's the

12    tech person so I don't want to misrepresent, but, you

13    know, they'll have every opportunity to explore that at

14    the deposition.  There was one working copy of TETRA in

15    the DTC -- the government contracting facility.  It's not

16    simply a matter of copying the software because it has to

17    be installed, has to have certain permissions, has to tie

18    with other data in order for it to be usable.  There was

19    only one copy that got to that point.

20                Some engineers there made copies of that one

21    working copy, but they didn't do the work that it would

22    take to install it.  As Mr. Calvin explains in the

23    deposition, the DTC was a contracted facility with

24    several different projects going on.  So something that

25    would be installed at one point wouldn't necessarily

```
 1    be -- you can't just copy it over and have it work
 2    because you have to tie to other parts of the computer
 3    system in order for it to work.  Those were the ones that
 4    were the subject of the change order saying, okay, delete
 5    those, we're stopping this iteration of the health record
 6    project, and those were the change orders in September of
 7    2014.
 8              Plaintiff's previous counsel said, we think
 9    these are inconsistent with your interrogatory responses.
10    We furnished Mr. Calvin's declaration explaining those
11    there for you to explore those and whether they're
12    inconsistent with --
13              THE COURT:  Well, where do the 232 fit in?
14              MR. TODOR:  Okay.  So there were -- the initial
15    license was -- the Government licensed to purchase 64
16    process -- installations of TETRA, 64 processor cores.
17    After the decision was made to go to a different approach
18    on the health records system, my understanding is 4DD
19    came and said we think there are additional installations
20    of this.  There was a process where 4DD submitted their
21    information on how many installations they think there
22    were based on information from the government contracting
23    facility, the DTC in Richmond, and SMS's facility, which
24    wasn't under government control.
25              They sat down basically in a room, 4DD's
```

1    representative, SMS's representative and the government

2    contracting officer's representative.  4DD had a list of

3    how many installations they thought there were; SMS had a

4    list, talked it over.  They agreed on a figure of 232.

5    The 232 represents an agreed number of 64 because that's

6    what we paid for in Richmond.  It wasn't the product of

7    being able to go and get -- look at specific records from

8    that, in part because of DoD's cybersecurity

9    restrictions.  They don't -- when the software is on a

10   computer, sometimes it will ping back to the original

11   place to get a license key or to tell them that the

12   software is working.  Because of DoD security

13   regulations, they didn't do that; they couldn't do

14   that.

15           So there was an agreement that we were going to

16   pay for the 64 and there were an additional 168 licenses

17   which were identified -- or 168 instances agreed upon in

18   SMS's environment that that's the total of 232.  At

19   $10,000 per instance, we agreed to pay $1.7 million for

20   those additionals, and that was signed by both sides and,

21   I believe, paid in May of -- March of 2015.

22           THE COURT:  You said there was one working

23   copy.

24           MR. TODOR:  Yes.

25           THE COURT:  Now, how does that square with the

4DD Holdings, LLC v. USA                                    8/9/2017

1    64 that you paid for initially?

2              MR. TODOR:  Well, it would be less than 64.

3    Mr. Calvin says in his declaration that, to his

4    knowledge, it was never more than that.  But the one

5    working copy was achieved on the basis of testing work to

6    come up with one working copy.  So it may be as few as

7    one, but we agreed to pay for 64.

8              THE COURT:  And, ultimately, 232.

9              MR. TODOR:  Sixty-four through the DTC Richmond

10   facility is what we paid for, and then there are an

11   additional 168 identified in SMS which wasn't under

12   direct government control, they were under -- you know,

13   they were a contractor, and we paid for the SMS 168 on

14   top of the 64 we had already paid for for Richmond.

15             THE COURT:  All right.  Does it matter whether

16   or not any of those are nonfunctional or partial

17   installations?

18             MR. TODOR:  Well, I think that's the core of

19   the -- I'm guessing that's the core of the dispute

20   between Plaintiffs and us as to whether the subsequent

21   change orders make our interrogatory responses

22   inaccurate.  We think they don't because they were not

23   functioning installations.  Plaintiffs appear to have a

24   different view.  Again, we've disclosed the documentation

25   we have on the subsequent change orders, and those are

4DD Holdings, LLC v. USA                          8/9/2017

1    discussed in Mr. Calvin's May 3rd declaration.

2              THE COURT:  Well, what was the -- what was the

3    purpose behind those change orders?

4              MR. TODOR:  To have them deleted from DTC

5    Richmond.

6              THE COURT:  And the "them" is part of the 232

7    or some other universe?

8              MR. TODOR:  These would be ones that were

9    not -- well, these were not discussed as part of the

10   true-up process.  Now, to the extent that there was --

11   assume there's only one working copy, I think there are

12   29 lines listed on the one change order.  It could be a

13   matter of legal interpretation whether one -- you know,

14   the 29 would be still under 64, but these were not

15   discussed as part of the true-up process because -- the

16   true-up process because of the difficulty in accessing

17   the actual records for the DTC Richmond.  It was just

18   agreed upon that 64 was the figure for Richmond.  So

19   these additional copies of the one working copy were not

20   actively discussed at the time.

21             THE COURT:  I'm not sure I understand all that.

22   I didn't hear anything about a waiver or a release.

23             MR. TODOR:  There was a release in the true-up.

24             THE COURT:  And does it extend beyond the 232?

25             MR. TODOR:  Well, it extends to, you know, the

4DD Holdings, LLC v. USA                          8/9/2017

1    entire subject matter of the dispute that they've raised
2    and we -- you know, we're considering whether we're, you
3    know, ultimately going to move for a summary judgment
4    based on accord and satisfaction after discovery on the
5    basis of that.  The release was signed by 4DD's
6    authorized reseller, IMMIX, which is a nominal third
7    party in the case.
8              MR. GILMORE:  And, Your Honor, from our
9    position, it's not a release.  It's a contract
10   modification, but it's not a release.  And as I think Mr.
11   Todor just admitted, the copies that are referenced in
12   this are -- Calvin's second declaration -- weren't
13   discussed, meaning they weren't disclosed to 4DD.  4DD
14   didn't have access to the DTC.
15             And I think Mr. Todor was explaining, normally,
16   it's -- software has like a ping-back or a phone home
17   function that sends a message back to 4DD, hey, someone's
18   trying to copy your software.  That had to be turned off
19   according to the Government for cybersecurity reasons.
20   So our client is in the dark as to what was being done in
21   terms of the copies that were being made.  And that's
22   what we're -- that's what we're trying to get at now.
23             We know the number that was dinged because
24   that's the number that the Government told us.  This is
25   what we think the number is and this is what we're

4DD Holdings, LLC v. USA                                    8/9/2017

1    willing to pay and we signed a contract modification for
2    it, but we didn't know about the additional copies.  We
3    learned about that discovery once we see these documents.
4    And we're asking for a count.  It seems undisputed that
5    there are more copies of this software.  I mean, you can
6    (inaudible) qualifiers that the Government wants to.  But
7    we want a number.  What is the number of copies that were
8    made?  Whether configured, partially installed, once
9    installed --
10            THE COURT:  Well, hang on a second.
11            MR. GILMORE:  -- uninstalled, deleted.
12            THE COURT:  Do you have agreement as to -- have
13   you defined that term "copy" to include nonfunctional
14   partial installs?
15            MR. GILMORE:  I believe that it is defined that
16   way adequately in the interrogatory responses and if --
17            THE COURT:  Well, hang on.
18            MR. GILMORE:  Sure.
19            THE COURT:  Did you understand the question to
20   include nonfunctional partial installs?
21            MR. TODOR:  No, we understand that the question
22   was installations and we had a -- they had a very broad
23   definition of what would be defined as an installation.
24   Our interrogatory response had, you know, objections to
25   that as not being consistent with contractor usage.  But

4DD Holdings, LLC v. USA                          8/9/2017

1    it was explained what it was and what we weren't

2    answering.  And then we provided the additional

3    declaration from Mr. Calvin specifically addressing

4    these, you know, partial installations, whatever you

5    would call them, on May 3rd.

6              THE COURT:  So, did he -- did he give a number

7    for those?

8              MR. TODOR:  Not in terms of the number of

9    processor cores because that data wasn't there.  We give

10   -- we gave the records with the change orders that listed

11   the numbers of -- whatever you call them -- copies,

12   whether -- how many processor cores each of those

13   represented.  I don't know that the documents actually

14   stated that.  But we gave all the information that we had

15   on them.

16             THE COURT:  Why did it take -- what did you say

17   -- five change orders to delete all these attempted

18   copies?

19             MR. TODOR:  We think -- well, from what I was

20   told by the client, at least two of the orders were

21   redundant.  So one identified only 29; one, I think,

22   identified another one.  The rest, we think, were just,

23   you know, okay, delete them all just in case.  But our

24   understanding is that that's all the ones that we knew

25   of.

4DD Holdings, LLC v. USA                              8/9/2017

1          THE COURT:  And so you're saying -- I don't
2     have the change order in front of me obviously.  You're
3     saying the change order was specific to the number of
4     expected deletions?
5          MR. TODOR:  There were certain -- I believe
6     they said, basically, delete anything, but here are the
7     ones we know about.
8          THE COURT:  And so by location, by person, by
9     desk, by --
10          MR. TODOR:  By file -- there's a file list
11     descriptor that had like 29 entries, I believe.
12          THE COURT:  Are they on a central server?
13          MR. TODOR:  There were -- on the DTC servers in
14     Richmond were the ones that were on those change orders.
15          THE COURT:  Why would it take multiple copies
16     on a single server?
17          MR. TODOR:  Well, my understanding was that
18     they would -- the copies -- the one working copy, because
19     they were doing testing and installation, so they were
20     testing how it would work configured one way, testing how
21     it might work if configured another way.
22          THE COURT:  When you say "nonfunctional," what
23     do these systems lack to make them functional?
24          MR. TODOR:  Mr. Calvin discusses that in his
25     declaration.  Generally, there are permissions that are

1    required in the installation of a software.  One is

2    called ports, where you have to have access to other

3    parts of the -- I guess the network in order for things

4    to work.  Another is this process of resources.  Another

5    is what kind of databases it would tie into.

6            So this is to work with health records.  So

7    what kind of records would it be able -- would it be

8    configured to tie into?  Different health record

9    configurations might work differently.  I don't know all

10   of the technical details, but those are the kinds of

11   things that he discusses in his declaration.

12           THE COURT:  You're not talking about

13   permissions coming from the Plaintiff for these --

14           MR. TODOR:  No, computer permissions.  So

15   technical permissions within -- the DoD server has

16   restrictions on what information a program is allowed to

17   access.

18           THE COURT:  So if one of these nonfunctional

19   partial installations had, in fact, been -- received the

20   necessary permissions, that would have been added to the

21   232?

22           MR. TODOR:  Well, I guess my answer would be

23   these -- they learned of these -- well, these were only

24   discussed -- these were not discussed as part of the 232.

25   If they -- if it came to the point where it becomes a

1    full install, it would be the kind of thing that would

2    count against one of our 64, yes.

3         But there wasn't -- my understanding was these

4    were not looked at in the context of are these going to

5    count against the 64 because these weren't considered to

6    be actual installations and it was kind of a separate

7    process from the true-up process.

8         MR. GILMORE:  And, Your Honor, the separate

9    process is deleting a bunch of copies of our client's

10   software that the Government didn't tell us existed.  I

11   mean, that's -- Mr. Todor is dressing that up, but that's

12   what he's describing, and the documents support that.  I

13   mean, there's numerous documents where Mr. Calvin says,

14   delete copies of this from the various environments, and

15   that is after our client raised their hand and said,

16   look, from the limited information we have, it looks like

17   you may have exceeded your license.  And that prompts a

18   whirlwind of activity between the Government and the

19   contractors that leads to a furious effort to delete all

20   of these copies of TETRA that they have in this test

21   environment and --

22        THE COURT:  Well, hang on a second.

23        MR. GILMORE:  -- presumably have been operating

24   for quite some time.

25        THE COURT:  We're outside the SMS world here

4DD Holdings, LLC v. USA                                    8/9/2017

1    for these nonfunctional partial installs?

2             MR. GILMORE:  Yeah, this is -- we're talking

3    about just the DTC right now.

4             THE COURT:  Okay.

5             MR. GILMORE:  We're not even talking about the

6    SMS lab, which is a separate issue.

7             THE COURT:  All right.  Mr. Todor says, well,

8    if we have figured out how to make them functional and

9    fully installed, that would have -- we would have gotten

10   -- you'd have to have a credit for paying one of the 64,

11   right?  Do you understand what his point was there?

12            MR. GILMORE:  Well --

13            THE COURT:  In other words, they had paid for

14   64 installs, hadn't used them.  So if we had a functional

15   fully installed one, we've already paid for 64 of them.

16            MR. GILMORE:  I'm not sure that we agreed that

17   they paid for but didn't use 64 installs.  In other

18   words, it sounds like he's saying we have a credit for 64

19   installs.

20            THE COURT:  Right.

21            MR. GILMORE:  We don't agree to that as an

22   accurate characterization of what occurred here, in

23   particular because there wasn't information -- this

24   information.  I mean, Mr. Todor just admitted that it

25   wasn't discussed that, well, we have all these copies and

4DD Holdings, LLC v. USA                              8/9/2017

1    maybe they haven't been configured yet or activated yet
2    that were deleted.  None of that was discussed with our
3    client about that.  And so --
4           THE COURT:  Are you satisfied that -- well,
5    first of all, the affidavit, or plural, that Calvin
6    wrote, do they attempt to quantify this different
7    universe?
8           MR. GILMORE:  They do not.  They don't attempt
9    to quantify the universe of what we've just been
10   discussing, these copies that were in the environment
11   that were maybe not configured yet or maybe partially
12   configured, but were deleted, all of which occurred prior
13   to the contract modification being entered into and none
14   of which was discussed or disclosed to us.
15          THE COURT:  All right.  Is there any reason
16   Calvin can't quantify these that were the subject of the
17   change orders?
18          MR. TODOR:  Well, I guess the -- a limitation
19   on that would be he had -- we have the change orders that
20   were disclosed in discovery, you know, and discussed with
21   Plaintiff's counsel.  Those have lists of, you know, what
22   was not.  I'd rather them have just said, you know,
23   delete everything just to make sure.  I don't know that
24   we have any information on the number of those beyond
25   what is expressed in those change orders.

4DD Holdings, LLC v. USA                          8/9/2017

```
 1          So if the question is is there an ability to
 2   say definitively how many of these other partial installs
 3   there are and how many processor cores they were on, I
 4   would say -- we would certainly, you know, ask Calvin,
 5   but at least from what I understand, the ability to do
 6   that might be limited by the fact that all we really have
 7   are these change orders that may or may not have every
 8   bit of information on the number of processor cores that
 9   would be responding the way the Plaintiffs phrased their
10   interrogatory in the case.
11          THE COURT:  Well, I assume the interrogatory
12   asks for a number.
13          MR. GILMORE:  It does, yes, of installs,
14   uninstalls, reinstalls.  I think it's broad enough so
15   that we're talking about copies of the software even if
16   it's configured or nonconfigured.
17          THE COURT:  Well, was that question put to Mr.
18   Calvin?
19          MR. TODOR:  I believe he verified that
20   response.
21          THE COURT:  And I thought there wasn't a
22   number.
23          MR. TODOR:  So the number was 232 all told,
24   which was the number from the true-up process, and then
25   the -- these partial installs were not part of the 232
```

4DD Holdings, LLC v. USA                                    8/9/2017

```
 1    because the interpretation was these are not installs,
 2    uninstalls or reinstalls.
 3              THE COURT:  Well, the Plaintiff is --
 4              MR. TODOR:  But he did give a separate
 5    declaration discussing, you know, what he knows about
 6    those.
 7              THE COURT:  Well, if he knows the numbers of
 8    the nonfunctional partial installs or other copies other
 9    than this true-up, I want him to furnish that before the
10    deposition.
11              MR. TODOR:  Understood.
12              THE COURT:  Well, is that sufficient for now?
13              MR. GILMORE:  On this topic, I believe it is,
14    Your Honor.
15              THE COURT:  All right.  What other topics?
16              MR. GILMORE:  There is an additional issue
17    which we've requested from the Government.  We were --
18    it's clear that the Government obviously is working very
19    closely with us in this, I think the main contractor at
20    issue in this case.  And we've looked at the Government's
21    contract with SMS and it gives the Government ownership
22    over SMS's work product essentially.
23              So we asked the Government to -- whether the
24    Government had requested that SMS furnish to the
25    Government any of the documents that the Government had a
```

1    contractual right to and that would be responsive to our

2    discovery request.  And we've had several discussions

3    with Mr. Todor, we cited some cases to Mr. Todor that

4    hold the -- I think the well-established proposition that

5    if you have a contractual legal right to documents that

6    are in the physical possession of a third party, of a

7    nonparty, but you have a practical or legal ability to

8    obtain them, then you have possession, custody and

9    control over those documents.  And if they're responsive,

10   they need to be produced in response to party discovery.

11            So we identified that issue to Mr. Todor, and

12   the response that we received from the Government is,

13   well, the Government thinks the contract has expired or

14   expired prior to the -- to the discovery requests being

15   served in this case and so, therefore, the Government

16   doesn't have a right to ask.  We look at the contract and

17   the contract ownership -- the ownership doesn't say it's

18   a license, it doesn't say it terminates at the end of the

19   contract.  It says the Government owns the work.  The

20   Government shall have unlimited rights under this

21   agreement to all information and materials furnished by

22   the contractor performing work under the resulting

23   (inaudible).

24            So we think that there are unquestionably

25   documents that the Government needs to produce and --

4DD Holdings, LLC v. USA                                   8/9/2017

1     through the normal party discovery process regardless of
2     whether they are sitting physically right now with SMS.
3            THE COURT:  Do we need a motion to compel on
4     this?
5            MR. TODOR:  Well, we don't think so because we
6     don't think there's reason to.
7            THE COURT:  All right, well --
8            MR. TODOR:  Just for context, the contracts
9     expired, I've been informed by agency counsel, September
10    28, 2015.  The complaint in this case was filed August
11    28th, 2015.  The first discovery requests in this case
12    were filed May 9th, 2016.
13           THE COURT:  Well, that begs the question that
14    counsel was posing, whether or not the obligation goes
15    beyond the expiration date of the contract.
16           THE COURT:  Agency counsel said their
17    understanding of the contract is it doesn't and we
18    wouldn't have the right to make SMS do the extra work --
19           THE COURT:  Have you read the contract?
20           MR. TODOR:  -- when they're not under contract
21    with us.
22           THE COURT:  Have you read the contract?
23           MR. TODOR:  I looked at that provision.  I
24    don't recall the exact language.
25           THE COURT:  All right, I -- I'm not going to

4DD Holdings, LLC v. USA                                8/9/2017

1    rule on it now if you're going to oppose it, but -- I
2    want to see a copy of the contract.  Put it in a formal
3    motion to compel and attach it.
4              MR. GILMORE:  And we suspected that's what we
5    would need to do.  We were hoping perhaps the Government
6    would revisit its position today.
7              MR. TODOR:  To clarify, Your Honor, this -- SMS
8    was the party that was here at the previous status
9    conference in court where 4DD had filed a motion to
10   compel SMS to produce documents pursuant to their
11   subpoena.  SMS produced the documents that they thought
12   were responsive limited to the authorization and consent
13   issue that the Court said was the subject of this phase
14   of discovery.  SMS moved to compel; the Court denied the
15   motion.
16             The Government, when we made our --
17             THE COURT:  SMS moved --
18             MR. TODOR:  Mm-hmm.
19             THE COURT:  -- SMS moved to compel?
20             MR. TODOR:  4DD moved to compel SMS.
21             THE COURT:  Right.
22             MR. TODOR:  SMS --
23             THE COURT:  Why did I deny the motion?
24             MR. GILMORE:  Your Honor, as we read the
25   transcript -- and we weren't at the hearing at that point

4DD Holdings, LLC v. USA                                    8/9/2017

1    -- we hadn't entered our appearance yet -- but as we read

2    the transcript, SMS counsel seemed to indicate, look, we

3    have many more project documents than what we're

4    producing, but we only -- it seemed we only are

5    producing, I think it's a couple hundred documents that

6    go to the authorization and consent issue.

7              Now, the Government hasn't bifurcated

8    discovery.

9              THE COURT:  Well, hang on.  So SMS said

10   everything that related to authorization and consent

11   we've turned over?

12             MR. GILMORE:  That is their -- that was their

13   argument.  And I think Your Honor said, well, if there's

14   nothing that they have, there's nothing more to compel.

15             THE COURT:  Right.

16             MR. GILMORE:  From our perspective, though --

17             THE COURT:  No, I understand this is a

18   different question.

19             MR. GILMORE:  It is.  And I would make this

20   point, the Government hasn't bifurcated.  Nor have we.

21   The parties haven't bifurcated the discovery.

22             THE COURT:  No, I understand.  Just go ahead

23   and make your motion to compel and attach whatever

24   documents I need to see.

25             MR. GILMORE:  We'll do that.

4DD Holdings, LLC v. USA                                      8/9/2017

1          THE COURT:  Okay.  What else?

2          MR. GILMORE:  We have some other issues in

3     terms of third parties.  We're working through having

4     discussion prior to the hearing and hopefully we can

5     reach a resolution with the Government.  There's another

6     contractor called ICS Nett, who has produced a number of

7     important documents.  They also had government-issued

8     laptops that are government property and contained

9     documents about a number of government projects,

10    including this one, but others as well.  ISC.net couldn't

11    even unlock the laptops without the Government.

12          We're trying to work through a process where --

13    and the Government has sent a proposal.  We sent a

14    counterproposal, and the Government objected to ours.

15    We're trying to work through it.  I hope that we can.  We

16    think that the Government, since they're government

17    laptops, needs to take more responsibility in terms of

18    obtaining the documents off these laptops and producing

19    them to us.  I take it that the Government sees things

20    differently.  I'd like to think we can reach a resolution

21    and we'll try and do that in the near future.

22          THE COURT:  Who actually has physical control

23    of these computers -- I mean, possession?

24          MR. GILMORE:  I believe they're still at ICS

25    Nett, although we've been contemplating either having the

4DD Holdings, LLC v. USA                          8/9/2017

1    laptops shipped to the Defense Health Agency IT folks or

2    perhaps having the Defense Health Agency IT folks come to

3    ICS Nett's offices.

4              THE COURT:  So they're not currently being

5    used?

6              MR. TODOR:  Actually, our understanding is they

7    are currently being used, but on a different project.

8              THE COURT:  Mm-hmm.

9              MR. TODOR:  So the same personnel is issued a

10   laptop and apparently they kept using the same laptop

11   that they were issued when they were working on the

12   contract at issue in this case.  Now they're working on a

13   different project for DHA.  So they still have the same

14   laptop.  That's kind of our concern is that there's going

15   to be information on those laptops not related to the

16   contracts at issue in this case.

17             So we're trying to work through with Plaintiffs

18   a procedure where ICS Nett would identify what's

19   responsive.  There's, you know, like I said, a technical

20   impediment because of DoD security to where they can't

21   just copy the data themselves.  We were willing to work

22   with them on doing that.

23             What we are not trying to do --

24             THE COURT:  Hang on.  What is it you want to

25   know from ICS?

4DD Holdings, LLC v. USA                                    8/9/2017

1              MR. GILMORE:  In terms of the responsive

2     documents?  I mean, what --

3              THE COURT:  What have you asked ICS to produce?

4              MR. GILMORE:   I think the project documents, I

5     mean, largely related to TETRA and use of TETRA and

6     interaction with 4DD.  I think that's the scope of the

7     subpoena to ICS Nett.  And ICS Nett has produced a large

8     volume of documents and they had some really important

9     documents, some of which have led to questions that we've

10    posed to the Government about the number of copies of

11    TETRA.  We actually got documents fro ICS Nett before we

12    got the Government's documents.

13             But we have this remaining set of, well, we

14    also -- ICS Nett said, we also have these laptops, we

15    think they were used on the project, we think that they

16    likely have additional responsive documents to your

17    subpoena about TETRA and 4DD and the project -- the IMMIX

18    project.  So what we -- it's the Government's laptops.

19    We can't even access them.

20             From our perspective, I think we're just trying

21    to accelerate things by saying, look, why don't the

22    parties to the suit be the ones that take responsibility

23    for this since it's the Government's property anyway.

24    These are government computers being used for government

25    contracts, not just the project here.

4DD Holdings, LLC v. USA                              8/9/2017

1          So that's why we're telling -- our position we
2   conveyed to Mr. Todor is, this whole back and forth of
3   you do part of it and send it back to ICS Nett, why can't
4   the Government just take ownership since it owns these
5   computers and just produce the documents itself.  And Mr.
6   Todor has resisted that and --
7          THE COURT:  Well, if they're in use, I assume
8   it wouldn't be the easiest thing in the world just to
9   take it away from somebody.  But I will just take it at
10  face value that you're trying to figure out a way to
11  access those computers that would be responsive to the
12  Plaintiff's discovery request.
13         MR. TODOR:  And our -- the approach we
14  suggested is DHA could issue the same personnel a new
15  laptop so they could image what they had and, you know,
16  give them a new one, and then we would -- so they could
17  continue work, you know, under their new contracts.
18         THE COURT:  Mm-hmm.
19         MR. TODOR:  So the people can keep doing work.
20  The issue really becomes how the contents of the laptops
21  that are going to be in use are going to be worked over
22  to determine what's responsive and what confidentiality
23  applies to the documents that are responsive to the
24  subpoenas with the knowledge that these contain
25  information from contracts unrelated.  So we don't know

4DD Holdings, LLC v. USA                                    8/9/2017

1    how --

2              THE COURT:  You're not talking about --

3              MR. TODOR:  -- ICS keeps their data.

4              THE COURT:  You're not talking about what

5    they're currently being used for but when they were

6    originally being used for whatever work is relevant

7    here --

8              MR. TODOR:  Right.

9              THE COURT:  -- they had information that

10   Plaintiff wouldn't be entitled to access.

11             MR. TODOR:  Well, what they -- okay, so my

12   understanding is what they were originally working on is

13   the kind of thing Plaintiffs would be entitled to.

14             THE COURT:  All of it?

15             MR. TODOR:  Or at least what was -- what

16   pertained to the work on this contract that would be

17   within the scope of their subpoena.  Then there would be

18   information from -- after, you know, they stopped working

19   on this, that would be unrelated, that they wouldn't be

20   entitled to.

21             THE COURT:  Why can't they just be pulled off

22   of there or vice versa?  I mean, I assume the Plaintiff

23   doesn't care whether it gets the existing computers minus

24   whatever is subsequent or vice versa.  But I just don't

25   want this thing hanging out in limbo.

4DD Holdings, LLC v. USA                                    8/9/2017

1            MR. TODOR:  Right.  We proposed a procedure
2    where ICS Nett identifies what's responsive and then, you
3    know, we would copy it and we'd produce it to the
4    Plaintiffs.  Plaintiffs proposed a procedure where the
5    Government searches the laptops to try to find what's
6    responsive off of them and the Government reviews it for
7    responsiveness, the Government reviews it for
8    confidentiality and then produces that to Plaintiffs.
9            Plaintiffs issued a subpoena to ICS Nett.  It's
10   ICS Nett's, you know, responsibility to comply with that
11   subpoena.  So we don't think it's appropriate for the
12   Government to be determining, you know, information which
13   is being kept by ICS Nett in ways ICS Nett chooses,
14   whether that is responsive to their subpoena and what
15   isn't.
16           THE COURT:  Well, I assume, if I had to rule on
17   it, I would say that it would be sufficient for ICS Nett
18   to be the one doing the responding.  But what I heard at
19   the beginning of this was that ICS didn't feel the
20   liberty go onto these computers because they're
21   government property.  That piece of it has to be
22   eliminated.
23           MR. TODOR:  And that's what we proposed to do
24   in terms of the technical procedure was --
25           THE COURT:  Mm-hmm.

1          MR. TODOR:  -- we were on a call with

2     Plaintiff's counsel and ICS Nett's, I believe, director

3     of operations.  The conversation was, well, we don't have

4     -- ICS Nett's person says, well, we don't have basically

5     administrative privileges on these laptops that would let

6     us copy the contents because DoD locked it down.

7          THE COURT:  And has that problem been solved?

8          MR. TODOR:  So that's what we would -- that's

9     what we'd propose to solve by the procedure we propose

10    where, you know, DoD would do the copying of the actual

11    data.  The work of determining, once we do that, what's

12    responsive, that seems to be the conversation we're

13    having with Plaintiffs.

14         MR. GILMORE:  And the reason why we thought

15    that our position and our proposal was better is because

16    the Government is going to be reviewing these documents

17    anyway as it has done with the other third party subpoena

18    productions to assess the confidentiality assertion that

19    the Government intimated that we made.  And so we said,

20    look, if these are government laptops that you, the

21    government itself, is required to access because the

22    contractor who has temporary use of them can't, and the

23    Government's going to be copying and then the Government

24    is going to be looking at the documents anyway, let's

25    just streamline this.  Why can't the Government do soup

1    to nuts here rather than this complicated back and forth

2    with ICS Nett?  That was our proposal, Your Honor.  I

3    didn't think it was unreasonable.

4              THE COURT:  And that's unreasonable because?

5              MR. TODOR:  Well, we don't think we should be

6    in the position of having to determine what is and isn't

7    responsive as a first cut out of ICS's information,

8    particularly with the knowledge that there is information

9    on those that doesn't apply to the contract at issue in

10   this case.  So, you know, we would be in the position of

11   reviewing who knows how much information is on, I think,

12   12 laptops, most of which is -- you know, much of which

13   is going to be nonresponsive.  That should be ICS's

14   responsibility since they're the party that got the

15   subpoena, not us.

16             THE COURT:  Well, we'll try the Government's

17   approach initially.  I think ICS is probably going to be

18   in a better position to do the segregating initially.  I

19   don't buy the argument that the Government can't do it if

20   it comes to that.  But for the time being, since the

21   subpoena is to ICS and since they're probably going to be

22   in a better position to segregate things, we'll go that

23   route.

24             MR. GILMORE:  Understood, Your Honor.

25             THE COURT:  What else?

4DD Holdings, LLC v. USA                           8/9/2017

 1            MR. GILMORE:  I think that is it from our

 2     perspective, Your Honor.  We have requested dates for

 3     depositions of additional government witnesses in the

 4     September to early October time frame, beyond Mr. Calvin,

 5     and we're waiting to hear back from the Government on

 6     that.

 7            We've also requested that the Government

 8     produce five additional custodians' emails pursuant to

 9     the ESI protocol, and as I understand it, the Government

10     is in the process of doing that.  So we -- hopefully,

11     that will happen quickly.

12            THE COURT:  Okay.

13            MR. GILMORE:  So we're trying to push forward

14     on all fronts.

15            THE COURT:  Remind me, is there any law on the

16     subject of whether or not a license would be triggered by

17     an unsuccessful effort to copy or an incomplete effort?

18            MR. GILMORE:  Well, I think that -- as I

19     understand it -- I don't know the answer to that.  I'll

20     be -- I'm not sure that's the question.  Because as I

21     understand it, I don't think that it's an unsuccessful

22     effort to copy.  I think that copies of the software were

23     made.  It's just a question of whether they were

24     configured or activated.  So I think the analogy -- the

25     way we've been thinking about it -- and I'm not a

4DD Holdings, LLC v. USA                          8/9/2017

1    computer expert -- but it seems to me if you make a copy

2    of the book but you don't read it -- read the copy, have

3    you still made -- if it's unauthorized, isn't that still

4    copyright infringement?  And we would say yes.

5            So I think that may be a little bit too

6    simplistic, but that's kind of how we're thinking of it.

7    So I don't think that it's a question of, well, if you

8    only made a copy of half a book or a fragment of a book,

9    it's -- they made a whole copy of a book.  It's just a

10   question of did anyone open it and start reading it or

11   read a few pages but not read the whole thing.

12           THE COURT:  Okay.

13           MR. GILMORE:  I think if you make a copy of the

14   book, regardless of whether you read the whole thing or

15   not, and you didn't have -- you violate the copyright.

16   And I think that's what we're talking about here.

17           Now, the Government may disagree and I think

18   part of this is we're trying to understand the number of

19   copies here.  But from our perspective, that's how we

20   view the question of copies.

21           THE COURT:  So the -- as things currently

22   stand, the target is this group of potential

23   installations that Mr. Calvin alluded to in his

24   affidavits that are the subject of these deletion change

25   orders?

```
 1              MR. GILMORE:  I think there are two buckets.  I
 2     think there is the copies of TETRA that were in the
 3     Government's DTC and then there's the --
 4              THE COURT:  Well, I thought that had been paid
 5     for.
 6              MR. GILMORE:  Well, that's what we're talking
 7     about here because there were these -- the discussions we
 8     were having were about additional copies, not disclosed
 9     to 4DD, that were deleted and, as I understand Mr. Todor
10     describing Mr. Calvin's declaration, well, those were not
11     configured or not used or something different so they
12     don't count.
13              THE COURT:  Oh, okay.  Well, I guess that was
14     my first bucket.  So what's the second bucket?
15              MR. GILMORE:  So the second bucket is copies in
16     the SMS lab.  And as I -- as we understand it, that's the
17     subject of the Government's motion to dismiss on the
18     authorization and consent.  I don't believe there's a
19     dispute from the Government that copies in the
20     Government's DTC --
21              THE COURT:  Do we know how many were in SMS or
22     have we talked about that at all today?
23              MR. GILMORE:  No, I don't think we've talked
24     about that and I think that is a separate issue.  I think
25     that certainly that gets to the documents that we're
```

4DD Holdings, LLC v. USA                                8/9/2017

1    trying to get from SMS.

2              THE COURT:  Okay.

3              MR. GILMORE:  But we intend, obviously, to

4    pursue that through depositions of SMS, as well as

5    government witnesses involved with interfacing with SMS

6    and the SMS lab environment.

7              THE COURT:  And so what have you kicked up, if

8    anything, on the authorization and/or consent?

9              MR. GILMORE:  Well, from our perspective, I

10   think that that is something that we -- we certainly see

11   a number of instances where the Government was fully

12   informed and working side by side with SMS about what was

13   going on in the SMS lab environment.  And we -- it

14   appears that SMS is trying to argue that they didn't know

15   that they needed to pay for the copies they were using in

16   the lab environment, and we strongly dispute that.  The

17   contract we had with SMS was clear.  So we've certainly

18   found documents that the Government has produced and that

19   evidence the Government's knowledge and participation of

20   what was going on in the SMS lab.

21             THE COURT:  Do you have a separate suit against

22   SMS?

23             MR. GILMORE:  No, we do not have a separate

24   suit that we've filed against SMS.

25             THE COURT:  I mean, are they still in business?

4DD Holdings, LLC v. USA                                    8/9/2017

1            MR. GILMORE:  Oh, very much.  SMS originally

2    was bought by Lockheed Martin and then was sold as a part

3    of Lockheed Martin selling a large portion of its

4    business to Leidos, a major contracting -- government

5    contractor.  So SMS is now a -- as I understand, a

6    subsidiary of Leidos.

7            THE COURT:  Okay.  That's all I needed to find

8    out for now.

9            Government, anything else?

10           MS. TODOR:  No.

11           THE COURT:  Sufficient?  Okay, thank you both.

12   We're adjourned.

13           MR. GILMORE:  Thank you, Your Honor.

14           MR. TODOR:  Thank you.

15           (Whereupon, at 2:31 p.m., the hearing was

16   adjourned.)

17

18

19

20

21

22

23

24

25

55

4DD Holdings, LLC v. USA                                    8/9/2017

```
 1                   CERTIFICATE OF TRANSCRIBER

 2

 3         I, Elizabeth M. Farrell, court-approved

 4    transcriber, certify that the foregoing is a correct

 5    transcript from the official electronic sound recording

 6    of the proceedings in the above-titled matter.

 7

 8

 9

10    DATE: 8/22/2017              S/Elizabeth M. Farrell

11                                 ELIZABETH M. FARRELL, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```