```
 1              IN THE UNITED STATES COURT OF FEDERAL CLAIMS

 2

 3

 4    4DD HOLDINGS, LLC,                    )

 5              Plaintiff,                  ) Case No.

 6                   vs.                    ) 15-945C

 7    THE UNITED STATES OF AMERICA,         )

 8              Defendant.                  )

 9

10

11                         Courtroom 9

12           Howard T. Markey National Courts Building

13                  717 Madison Place, N.W.

14                     Washington, D.C.

15                Wednesday, October 4, 2017

16                        1:56 p.m.

17              Telephonic Status Conference

18

19

20           BEFORE: THE HONORABLE ERIC G. BRUGGINK

21

22

23

24

25    Elizabeth M. Farrell, CERT, Digital Transcriptionist
```

4DD Holdings, LLC v. USA                                    10/4/2017

```
 1   APPEARANCES:

 2   ON BEHALF OF THE PLAINTIFF:

 3            EDWARD H. MEYERS, ESQ.

 4            PHILIP J. O'BEIRNE, ESQ.

 5            Stein, Mitchell, et al.

 6            1100 Connecticut Avenue, N.W.

 7            Suite 1100

 8            Washington, D.C. 20036

 9            (202) 737-7777 / (202) 296-8312 (fax)

10            emeyers@steinmitchell.com

11

12

13

14   ON BEHALF OF THE DEFENDANT:

15            JOHN JACOB TODOR, ESQ.

16            U.S. Department of Justice - Civil Division

17            Post Office Box 480

18            Ben Franklin Station

19            Washington, DC 20044

20            (202) 616-2382 / (202) 514-8640 (fax)

21            john.todor@usdoj.gov

22

23

24

25   *No other parties were identified on the record
```

4DD Holdings, LLC v. USA                                    10/4/2017

```
 1                    P R O C E E D I N G S
 2                    -   -   -   -   -
 3          (Proceedings start mid-recording, 1:56 p.m.)
 4          THE COURT:  Tell me what you understand the
 5   status quo to be in terms of production from anybody that
 6   you have sent a subpoena to.
 7          MR. O'BEIRNE:  That's a long list, Your Honor.
 8          THE COURT:  Is it?
 9          MR. O'BEIRNE:  So I can certainly start with
10   the ones that we have the most information about.  You're
11   familiar, obviously, with the SMS subpoena back and forth
12   because there's been some motions practice about that.
13   We have received some documents from other nonparty
14   contractors.  ICS-Nett produced a small amount of
15   documents.
16          Fulcrum -- there's a handful of other names,
17   Your Honor, that may not mean much to you because they
18   haven't figured prominently either in the volume or they
19   were not the main contractors in the case.
20          Deloitte has produced nothing and has indicated
21   they have nothing, which obviously we believe is not
22   consistent with the --
23          THE COURT:  What was their role?
24          MR. O'BEIRNE:  They were developing one aspect
25   of the software, Your Honor, the viewer that would allow
```

4DD Holdings, LLC v. USA                                    10/4/2017

1    you to actually look at these electronic records and

2    interact with them.  That married up and received

3    information from the databases that were being

4    facilitated by TETRA.  We understand that they had access

5    to the SMS environment, to the Government's testing

6    centers, and there's even an email from a Deloitte

7    employee to a 4DD employee saying, hey, I understand

8    we're using TETRA, can you tell me more about it, we've

9    been downloading it, and the respondent said, what do you

10   mean.  And they said, oh, well, never mind.

11         So we've got four Deloitte emails in the

12   Government's production extensively CC'ed on

13   communications regarding the project and at least a

14   handful of communications directly with 4DD about the

15   interaction of their role developing the JLV, the joint

16   legacy viewer, and how it would fit into the system that

17   the Government was developing in the project.  And,

18   again, they've indicated they have no responsive

19   documents.

20         THE COURT:  All right.  Others?

21         MR. O'BEIRNE:  We're continuing to communicate,

22   Your Honor, with some additional nonparties who had not

23   responded and we're following up to see if their response

24   was -- or their failure to respond was because they're

25   taking the position they don't have documents or that

4DD Holdings, LLC v. USA                                    10/4/2017

```
 1    they -- you know, for example, MITRE has asked us to
 2    narrow the search terms.  It's unclear to what extent
 3    they're going to produce responsive documents.  Some
 4    contractors -- some that you're familiar with, Your
 5    Honor, have said that they gave the documents back to the
 6    Government, that they were working with
 7    government-furnished equipment and government emails and,
 8    therefore, the Government would be in possession.
 9              So that's been an aspect that we're trying to
10    negotiate as to what extent would there be documents
11    still in the possession of these parties, such as SMS,
12    who were using their own emails and had their own systems
13    and to what extent were parties only using
14    government-furnished equipment.  And that's something
15    we've been, you know, digging into and trying to get our
16    arms around.
17              THE COURT:  This is rather basic and not
18    related to the current issue, but in terms of TETRA as a
19    software, is it currently still in use?  Is it still
20    being marketed, sold, used?
21              MR. O'BEIRNE:  You mean in general, Your
22    Honor?
23              THE COURT:  Mm-hmm.
24              MR. O'BEIRNE:  In the marketplace to other
25    people?  Absolutely, the company still actively uses the
```

1    software in its projects and is developing uses for
2    commercial purposes in a variety of fields.
3            THE COURT:  All right.  Let me leave it there
4    for a minute and let's talk about the Government's
5    position.  The -- I tried to extract, I guess, on the
6    motion to compel, and categorize the Government's
7    defenses to it and I've come up with the following.  A,
8    nonconsultation.  Are we past that?
9            MR. TODOR:  We spoke with the Plaintiffs
10   yesterday and so we did consult -- you know, they asked
11   for the documents from other contractors, so that was the
12   ground we raised for nonconsultation.  The motions today
13   did do that.
14           I would also note I asked them in our
15   conversation yesterday, please name the prime contractors
16   that you're asking us to get documents from.  They named
17   the three that were in their motion, SMS, Deloitte and
18   MITRE.  They named two others, Axiom and I believe ICS-
19   Nett.  They said there may be others, they didn't -- they
20   weren't sure.  So as we sit here, we're still not sure
21   what third parties the Plaintiffs are asking us request
22   documents from under respective contracts.  Those
23   contracts may have different terms.  Some may be active,
24   some may be inactive.  There may be different defenses
25   or --

4DD Holdings, LLC v. USA                                    10/4/2017

1              THE COURT:  Well, with respect to --

2              MR. TODOR:  -- you know, some who might do it.

3              THE COURT:  -- with respect to the five that

4    you did know about, what's the status of those?  Are you

5    asking?

6              MR. TODOR:  My understanding is SMS, Deloitte,

7    MITRE -- well, the contracts they attached are expired.

8    MITRE, I believe, has a number of different government

9    contracts.  Some of those may be active.  They haven't

10   pointed us to a data retention one with respect to the

11   DTC Richmond project, in particular.

12             We need to research further to determine

13   whether there are active contracts for Deloitte or MITRE

14   other than the ones that they attached to their motion to

15   compel.  Those ones, you know, appear on their face to be

16   expired.  But we don't know whether there are other

17   active ones for those contractors or whether those would

18   have specified some kind of document retention with

19   respect to this kind of document and that's --

20             THE COURT:  Well, let me make sure I

21   understand --

22             MR. TODOR:  -- that's our understanding on

23   that.

24             THE COURT:  You're familiar with, I gather,

25   four or five of the subs.  SMS, Deloitte, MITRE, ICS,

4DD Holdings, LLC v. USA                          10/4/2017

1    what else?

2              MR. TODOR:  Axiom I believe is the other one

3    they named.  Those were not subcontractors; those were

4    prime contractors.

5              THE COURT:  All right, primes, whatever.  Are

6    you telling me that if you had the names, you would go

7    approach these people and say, give us what you've got?

8              MR. TODOR:  We determined whether there was an

9    active contract with some kind of document, you know,

10   production requirement.  And in that case, we would.  At

11   this point, we haven't seen that.

12             THE COURT:  Well, let's talk about that.

13   Active contracts.  Is it your position that if a contract

14   is no longer active, the prime contractor has no

15   obligation to respond to discovery requests initiated by

16   the Government?

17             MR. TODOR:  Well, in this case, this is not a

18   discovery request initiated by the Government, so we

19   would be perfectly within our rights to issue a Rule 45

20   subpoena to a third party contractor if it's contract had

21   expired just like the Plaintiffs are able to.  So that's

22   a discovery request.  Our understanding is that

23   Plaintiffs are not asking us to make a discovery request;

24   they're asking us to -- as part of the Government's

25   response to their Plaintiff's discovery request, invoke a

4DD Holdings, LLC v. USA                                                  10/4/2017

1    contract term that would have had some kind of document

2    production required as a part of it.  So in response to

3    the Court's question --

4                THE COURT:  What's the practical difference?

5                MR. TODOR:  In terms of the practical

6    difference, the Court's question was about did the third

7    party have a responsibility to respond to a discovery

8    request.  Yes.

9                THE COURT:  I'm not talking about discovery

10   requests by the Plaintiff to a third party directly; I'm

11   talking about a discovery request to the Government where

12   the Government has a right, by contract, to obtain

13   material from a contract -- a contractor.

14               MR. TODOR:  If the contract is expired, our

15   position is then the third party would not have

16   responsibility to produce to the Government in response

17   to the -- a discovery request issued to the Government

18   unless there's some provision in the contract that would

19   go beyond the expiration of the contract that would call

20   for that.

21               THE COURT:  Well, let me disabuse you of that

22   one.  I've read the three, I guess, contract provisions.

23   I don't see anything that prohibits the Government from

24   asking.  And when a contract says this material belongs

25   to the Government, then, in my view, the expiration of

4DD Holdings, LLC v. USA                               10/4/2017

1    the contract doesn't end that obligation or the

2    contractor to respond to government requests for

3    information.

4             MR. TODOR:  Mm-hmm.  Then if I could turn to

5    our understanding of that clause as well, our

6    understanding is the ownership clause, which is meant to

7    deal with intellectual property rights, was limited by

8    its term to documents that were furnished by the

9    contractor, and those contracts have a list of

10   deliverables listed in the contract.  The SMS one does.

11   The MITRE contract referred to it as a contract data, I

12   believe, receivables list.

13            Those are specified in the contract.  Those are

14   what are supposed to be furnished by the contractor.  It

15   is our understanding that those would be required to be

16   furnished by the contractor during the term of the

17   contract and then, you know, the Government would have

18   those in our records and presumably we should have turned

19   them over to Plaintiffs already.

20            THE COURT:  Well, I've read -- I guess the

21   contract provisions are a little different, but I read

22   them considerably more broadly than that.  I don't think

23   it's limited to intellectual property produced by the

24   contractor for the Government.  I think the Government's

25   rights under the contracts that I have are much broader

1    than that, including the right to inspect the work, have

2    access to, make a copy of the above-mentioned items

3    which, at some point, include software, digital files,

4    data, everything produced under the contract by the

5    contractor.

6            And we need to talk about precisely what the

7    Plaintiff's question is.  But if the question is, for

8    example, do you have, have you ever used TETRA in

9    furtherance of this contract, I think the Government has

10   a right to demand that information.

11           MR. TODOR:  Okay.  Our understanding was -- and

12   if the Court disagrees, then we understand -- we have the

13   right to demand all of those things during the time of

14   the contract.  Now, the contract --

15           THE COURT:  Well, we just talked about that.

16           MR. TODOR:  -- is expired, so our

17   interpretation was we no longer would have the right to

18   demand that then our ownership of items was limited to

19   items that we actually demanded during the term of the

20   contract.

21           THE COURT:  I disagree.  I don't -- the

22   contract doesn't contain that exclusion and I'm not

23   reading the contract -- all three of them that I've seen

24   can't be read that way.  And I think the Government has a

25   perfect right to insist on after the expiration of the

1    contract anything that it could have asked for during a

2    contract.  I mean, it paid for that.  And so if you're

3    telling me the Government has not asked the question

4    whether or not, for example, TETRA was used or any

5    versions of it exist because the contract is expired,

6    that's not a legitimate reason not to ask the question.

7            MR. TODOR:  Well, at this point, we have not,

8    you know, made the request of third party contractors.

9    We -- what we did was we viewed our own files and

10   produced documents in our records, including those that,

11   you know, would have been delivered by the third parties

12   during the term of the contract.  But we have not sent

13   requests to the third parties to produce their -- any

14   files they have related to their work on the project.  We

15   did also have an issue with the payment, since that could

16   be considered a service, and with these contracts being

17   expired, again, we don't have a mechanism in place for

18   payment if the third parties are going to demand payment.

19   If the Court's interpretation is that there would be no

20   payment due and this is part of the contract duties, then

21   please advise us of that.

22           THE COURT:  I don't want to be too flip about

23   it, but my initial reaction is I don't care.  The

24   Government -- if it has access to that information, the

25   Government has to produce it.  And if that means the

1    Government pays for it, then the Government pays for it.

2    And if the contract allows the Government to ask for it

3    and doesn't make payment provisions, that's between you

4    and the contractor.  But the Plaintiff is entitled to

5    access to that information if you have the legal right to

6    ask of it -- of the contractor.  So I'm expecting that to

7    be produced.

8              MR. TODOR:  I understand, Your Honor.

9              THE COURT:  The fact that the -- the defense

10   about whether this is repetitive of efforts to get the

11   same thing from third parties, I mean, at some point that

12   might be relevant under different circumstances, but it's

13   not here, given what you're telling me about not even

14   asking the same information that obviously Plaintiff was

15   looking for from these contractors and the fact that the

16   Government asked me to put in place a protective order

17   which left me with the distinct impression that these

18   materials were being produced by third parties to the

19   Government for the Government's review, as if it had the

20   right to ask for them and the right to control them.  In

21   any event, the fact that the Plaintiff may have asked

22   successfully or not for these materials from third

23   parties for the time being is not controlling.  You have

24   a discovery request in front of you and I'm expecting the

25   Government to honor it.

4DD Holdings, LLC v. USA                                   10/4/2017

1              MR. TODOR:  I understand, Your Honor.  May I
2      clarify a couple points?

3              THE COURT:  Sure.

4              MR. TODOR:  First, with respect to the third
5      parties for both contractors and subcontractors, my --
6      you know, we -- I checked the agency when the lawsuit was
7      filed and when discovery requests were made, we informed
8      the third party contractors, both prime contractors and
9      subcontractors of the lawsuit and the litigation hold
10     placed in place to advise them of their responsibilities
11     that they face in response to third party subpoenas.
12     However, we did not solicit the documents from the third
13     parties for the Government's response.  We did inform
14     them of the lawsuit and inform them of the litigation
15     hold.

16             With respect -- the Court made reference to the
17     protective order and I believe the Court made a statement
18     that the documents were produced to the Government for
19     the Government's review.  The way the protective order of
20     January 30th (inaudible) structured, the parties actually
21     produced them to Plaintiffs.  They were placed under an
22     attorneys' eyes only designation and the Government was
23     given an opportunity to review and to make designations
24     of documents at a higher confidentiality level if it
25     chose to do so.  But the Government was not receiving the

4DD Holdings, LLC v. USA                                    10/4/2017

1    documents from the third parties and producing the -- the

2    Plaintiffs had been getting them directly from the third

3    parties.

4              THE COURT:  Or not, as in the case of some of

5    these folks, who indicate that they think -- is it ICS

6    that said we view this as subject to the Government's

7    control?

8              MR. TODOR:  Yes, that would be the document the

9    Plaintiff's attached.  We also attached the response from

10   the agency counsel stating that we cannot advise them on

11   their responsibilities.  And Plaintiffs actually attached

12   ICS documents to their motion to compel, so apparently

13   they have been getting them from ICS.

14             THE COURT:  Right.  Privileged documents, there

15   -- am I right in thinking about 13,000 have been

16   designated as privileged?

17             MR. TODOR:  As attorneys' eyes only

18   designations, not as attorney/client or work product

19   privilege.

20             THE COURT:  So in other words, these have been

21   turned over?

22             MR. TODOR:  Yes.

23             THE COURT:  They're simply stamped "attorneys'

24   eyes only?'

25             MR. TODOR:  Correct.

4DD Holdings, LLC v. USA                                    10/4/2017

 1            THE COURT:  Okay.
 2            MR. TODOR:  We also produced our privilege log
 3    to Plaintiffs separate from that, which lists the
 4    documents we've -- for which we've made a privilege claim
 5    which have not been produced to Plaintiffs.
 6            THE COURT:  With respect to what the Government
 7    is going to be asking contractors, the Government -- it's
 8    obviously virtually impossible for me to dissect contract
 9    by contract what the Government's rights are with respect
10    to data held by third parties.
11            I think Mr. Todor is correct that the mere fact
12    of a discovery request to the Government does not
13    translate into -- automatically into "and produce
14    everything responsive to the Plaintiff's discovery
15    request."  That third party, when we're using the
16    Government as a conduit for that material, I think the
17    Government's only entitled to ask what the contract
18    required the third party to maintain or produce or keep
19    for the Government's inspection.
20            So how -- do we need to negotiate what that
21    looks like?  I mean, how does Mr. Todor know what to
22    demand of the third parties in any given case?
23            MR. O'BEIRNE:  Your Honor --
24            THE COURT:  If it's something less extensive
25    than anything relevant to this lawsuit.

4DD Holdings, LLC v. USA                                    10/4/2017

```
 1              MR. O'BEIRNE:  To the extent that we're taking
 2    the broadest standing requests, our RFPs to the
 3    Government, we think that there are certainly RFPs
 4    included in the list that the Government already has that
 5    are core key contract documents about the use of
 6    software, about the project, et cetera, that plainly fall
 7    within the broad ownership rights as Your Honor was
 8    describing.
 9              If you think this is a workable solution, we
10    would be happy to highlight in our current existing RFPs
11    what we think are plainly contemplated by the contracts
12    and would likely be in the possession of these
13    contractors.  If the Government wants to then say the
14    following requests we think would be outside, we can try
15    to meet and confer about that, Your Honor.
16              But we don't -- we think to the extent that the
17    Court's going to order them to go get documents that we
18    believe they have, we believe full well within these
19    contracts and we think are clearly contemplated by a core
20    set of our RFPs, we don't want to get in the way of that
21    by looking for every single one of however many are
22    standing.  So we are happy to meet and confer with the
23    Government in order to officially proceed with them
24    getting and producing documents in their possession,
25    custody and control.
```

4DD Holdings, LLC v. USA                                    10/4/2017

1          THE COURT:  You don't have a motion to compel

2     in front of me with respect to third parties, do you?

3          MR. O'BEIRNE:  Not pending, no, Your Honor.

4          THE COURT:  Okay.  We can go back over the list

5     of elements of the motion to compel.  Well, I'll ask

6     Plaintiff, what defenses, arguments, issues have I not

7     alluded to on the motion to compel?

8          MR. O'BEIRNE:  Your Honor, I think your ruling

9     that the Government does have the contractual right to

10    obtain -- although we would obviously argue that's not

11    even necessary, a practical ability is sufficient.  But

12    to demonstrate a contractual right to obtain the

13    documents, render them within their possession, custody

14    and control and indicate they should go get them.  And to

15    the extent Your Honor is not entertaining the burden

16    argument for the reasons you stated on the record, I

17    think that addresses the relief we're asking for, Your

18    Honor.  We've mentioned several of the most prominent

19    contractors, SMS, Deloitte, MITRE, ICS.  Axiom is

20    another, as we've indicated in our discussion with Mr.

21    Todor.

22          So, again, we would be happy to meet -- if Your

23    Honor would give an order rendering relief -- the relief

24    we requested, we would be happy to meet and confer with

25    the Government on the contractors we're requesting they

4DD Holdings, LLC v. USA                                10/4/2017

1    reach out to and the RFPs we believe there would be

2    responsive documents to.

3            THE COURT:  Mm-hmm.  Well, the problem I have

4    with a clean ruling on the motion to compel is all I can

5    do is sort of dispose of arguments against it rather than

6    craft a paragraph that says the Government has to produce

7    X.  That's the problem I'm having.  So I'll take you at

8    your word you all can negotiate that.

9            The motion to compel as to SMS is moot, right?

10   It was denied as moot?

11           MR. O'BEIRNE:  Well, Your Honor, it was denied

12   in part.  There was, obviously, nonparty discovery to

13   compel SMS and they had drawn a line between

14   authorization and consent and the broader documents,

15   which is not a bifurcation that exists for party

16   discovery and that's one of the main reasons why we

17   wanted to obtain the documents from the Government,

18   because they're in their possession, custody and

19   control.

20           So I believe, Your Honor, that you left open

21   the possibility that we could revisit relief against SMS

22   if the discovery that was produced indicated there would

23   be more responsive documents than they were indicating

24   that they had because, at some point, they -- SMS

25   represented to the Court that this was all they had.  In

1    our review, we think that there would clearly be more.

2    So we certainly anticipate continuing to raise the issue

3    of what documents might need to be compelled from SMS.

4    But, obviously, if the Government is going to obtain the

5    documents through party discovery, then we can deal with

6    that as it remains necessary.

7              THE COURT:  With respect to the -- you alluded

8    to the issue about bifurcation or not.  I think that may

9    have been a confusion that I brought into the case myself

10   a long time ago at a point when we had -- when we still

11   had the Government's motion to dismiss on jurisdictional

12   grounds or failure to state a claim because of -- is that

13   what it is?  Lack of authority?

14             MR. TODOR:  Yes.

15             THE COURT:  All right.

16             MR. TODOR:  And the Court issued the discovery

17   plan in July of 2016 with the schedule through the two

18   issues.

19             THE COURT:  We had -- the issues were separated

20   chronology.  In other words, discovery on -- the first

21   motion to dismiss question was going to end early, but

22   the other would still be ongoing?

23             MR. TODOR:  Yes, Your Honor.  On pages 10 and

24   11 of our motion, in Footnote 5, we quoted the language

25   from the discovery plan and this was part of our

4DD Holdings, LLC v. USA                                    10/4/2017

1    objection on the SMS motion to compel, which is -- the

2    Court -- the discovery plan says if the Court denies the

3    Government's motion to dismiss, the parties will have

4    four months from the date of the Court's order to

5    complete any additional discovery on liability for the

6    alleged unauthorized copy in the SMS lab/environment.  As

7    we said in our motion --

8              THE COURT:  Was your motion to -- was your

9    motion to dismiss partial?

10             MR. TODOR:   It was partial insofar as it was

11   only on the SMS environment, not on the DTC, the

12   Government environment, because the issue in the motion

13   to dismiss was whether the Government had given

14   authorization and consent for SMS if SMS did unauthorized

15   copying in its environment, had the Government given

16   authorization and consent for SMS to do that.  That was

17   the basis for the motion to dismiss.

18             THE COURT:  But was SMS the -- is it the

19   primary or only relevant player in response to morphing

20   additional versions of this software?

21             MR. TODOR:  They were the prime for development

22   in their environment.  There were many other contractors

23   who work in the DTC environment.  Primarily, ICS-Nett was

24   the one doing the work.  There was a contractor, American

25   Systems, contracting the facility itself.  There was

4DD Holdings, LLC v. USA                          10/4/2017

1    another prime, Favor Consulting, under which MicroHealth

2    was a sub for program management.  So there were several

3    contractors working in the DTC environment.  SMS was a

4    prime and had its own environment where it was doing its

5    own thing.

6            THE COURT:  All right.  You want to take a shot

7    at answering that?

8            MR. O'BEIRNE:  Yeah, sure, Your Honor.  We take

9    issue with that characterization of how the work was

10   actually being performed on the project.  From the

11   documents that we've seen, there seems to have been

12   constant interworking between the Government and various

13   contractors and SMS, both in what was occurring in the

14   DTC and potentially the work that was doing on in SMS's

15   lab.  As we indicated, Deloitte was developing a

16   component of the software and we've seen numerous

17   communications where SMS was communicating with the

18   Government about work that was going on in the lab,

19   CC'ing other contractors with various related parts of

20   the project.

21           So it's a very sophisticated, complex software

22   development and logistics project, Your Honor, but we

23   don't believe it's as clean as that SMS was just working

24   away in their lab and they're the only ones with

25   visibility or access to or responsibility for the work

4DD Holdings, LLC v. USA                                    10/4/2017

1    that was going on there and that other work was being

2    done by the Government and other contractors outside the

3    lab.    It was much more fluid and overlapping than that

4    based on the documents we've managed to review -- obtain.

5            THE COURT:  Are you saying that replication, if

6    any, beyond what Plaintiff licensed, could have been done

7    by others beside SMS?

8            MR. O'BEIRNE:  Absolutely, Your Honor.

9    Absolutely.  SMS was working with virtual environments,

10   with virtual machines that could be cloned, saved, put on

11   an external drive and moved someplace else and we're

12   continuing to dive into the record to determine to what

13   extent, for example, when they were moving environments

14   from the SMS lab to some other location, the DTC or

15   elsewhere, they were then standing up these same virtual

16   machines other places.  So the nature of how the

17   technology operates allows for any number of people --

18   there's remote access.  Right.

19           If you're not located in the SMS lab, that you

20   have access to it through a remote desktop.  You can

21   remote it and, you know, work on virtual environments

22   that are present in the SMS lab.  We've -- the Government

23   referenced some of the contractors that were working in

24   the DTC, KSJ is another contractor that had a -- they

25   were staging and moving these environments in different

4DD Holdings, LLC v. USA                                      10/4/2017

1    places, Your Honor.  We think that involved any number of

2    contractors other than SMS.

3              THE COURT:  Well, again, this isn't directly on

4    point.  But at the time -- well, the Plaintiff obviously

5    knew about a certain amount of its licensing directly to

6    the Government, is that right?

7              MR. O'BEIRNE:  Your Honor, the Government

8    licensed the product, not directly from Plaintiffs, but

9    for Immix.

10             THE COURT:  Was the Plaintiff knowledgeable

11   about that license then?

12             MR. O'BEIRNE:  About the existence of the

13   license, yes, Your Honor.

14             THE COURT:  All right.  And so did the

15   Plaintiff have an understanding as to what the Government

16   planned to do with those copies that it did pay for?

17             MR. O'BEIRNE:  We -- the Plaintiff was

18   certainly aware of some aspect of the purpose for which

19   they would use the software in the project and we can get

20   into this -- a lot of detailed facts about this, Your

21   Honor.  But, typically, software has a phone home feature

22   that will speak back to the software owner when it's been

23   downloaded.

24             THE COURT:  Mm-hmm.

25             MR. O'BEIRNE:  That was turned off at the

4DD Holdings, LLC v. USA                                    10/4/2017

1    Government's request.  And the nature --

2              THE COURT:  Turned off by whom?

3              MR. O'BEIRNE:  The Government requested that we

4    turn off the phone home feature so that we would not

5    receive information over the internet when installation

6    occurred.

7              THE COURT:  Well, did that not set off alarm

8    bells?

9              MR. O'BEIRNE:  It's apparently a standard

10   requirement when operating in certain -- in government

11   environments where there's secure personal, medical or

12   other kinds of information.  But all that is to say we

13   were not -- we were operating with limited information as

14   to how the software was practically being used to say

15   nothing of the ways in which you can clone virtual

16   environments where you make carbon copies of a virtual

17   machine running the software that is exactly the same, it

18   doesn't require an additional license key.

19             So as we're now learning, there was a

20   tremendous amount of use of the software that wouldn't

21   have been visible to us at the time and communications

22   between SMS and the Government about cloning software

23   that we were not privy to and were not discussed with

24   4DD.

25             THE COURT:  Was the software developed

1    specifically with this application in mind?

2              MR. O'BEIRNE:  When you say "this application,"

3    Your Honor --

4              THE COURT:  By the Government for Defense

5    Health whatever.

6              MR. O'BEIRNE:  So I don't want to get out of my

7    depth just right in the moment, Your Honor, but so the

8    TETRA software is very versatile and can accomplish any

9    number of -- kinds of projects.  So the data federation

10   that was going on on this government project, there were

11   aspects of the TETRA services that are offered, snap

12   caches to store information so you don't have to run the

13   same searches again, the federated system that can allow

14   different databases to talk to each other.

15             All of those kinds of software can function for

16   other purposes, other kinds of projects, they would be

17   tweaked and designed and worked with by the Government

18   and these contractors to make them optimized for this

19   DMIX medical record sharing.

20             THE COURT:  Are you saying that in order for

21   TETRA to be used by the Government, the Government had to

22   do its own tweaking of the software?

23             MR. O'BEIRNE:  Well, Your Honor, they had --

24   not necessarily the underlying code of the software.  The

25   software can do -- there's TETRA studio where you can set

4DD Holdings, LLC v. USA                          10/4/2017

1    up and alter what you're asking the software to do, go

2    talk to the system, and then after you talk to the

3    system, route the information in this way and those are

4    different kinds of licenses.  They bought licenses for

5    the TETRA Services, the actual, you know, engine of the

6    software and then also Studio licenses so they could look

7    and see what the system they were setting up with the

8    software ware doing and then alter it based on the

9    information that was coming through or whatever the needs

10   were of the (inaudible).

11          THE COURT:  Well, I'm ignorant about most

12   complicated software, but typically I would think that

13   software of that complexity would require fairly constant

14   service by the licensor.

15          MR. O'BEIRNE:  Service was also contemplated,

16   Your Honor, by the contracts on a periodic basis.  One of

17   the benefits of the -- one of the great benefits of TETRA

18   is it doesn't have a lot of technical depth.  If you set

19   it up in a certain way, it doesn't end up -- and then you

20   want to take it over to another project, sometimes you'll

21   have software that then is overly complex or, you know, a

22   chandelier of functions and it collapses on itself

23   because it's now being asked to do something that it

24   wasn't being asked to do before.  It's very nimble.  And

25   so there was a service component to it, absolutely.

4DD Holdings, LLC v. USA                                    10/4/2017

1          But at the same time, it's demonstrated by the
2    project documents.  The Government's contractors were
3    able to use it and get great success in meeting the
4    benchmarks.  The Government was having certainly tests,
5    how many transactions can we do per hour, you know, can
6    we talk to these different systems.  And they were
7    working with the software in achieving these objectives
8    throughout and, you know, we were not -- we see now in
9    the Government's production, the deliverables that were
10   coming in from SMS.  We tested it this way, we arranged
11   it that way.  We were not on those communications.  We
12   don't have the insight in real time as to how they're
13   working with it.
14          THE COURT:  The entity that licensed it for you
15   or through which the Government licensed it, did it have
16   any ongoing responsibilities besides sales?
17          MR. O'BEIRNE:  Your Honor, when you say ongoing
18   responsibilities, I don't want to speak out of turn.  I
19   would want to go and obviously review that information in
20   more detail regarding the exact provisions of our
21   agreement with Immix and Immix's agreement with the
22   Government.  So...
23          THE COURT:  Well, have you taken discovery of
24   Immix or is Immix somehow -- are you co-owned by some
25   other entity?

4DD Holdings, LLC v. USA                                    10/4/2017

 1          MR. O'BEIRNE:  No, not co-owned, Your Honor.

 2     Immix is essentially someplace where the Government can

 3     go, you know, buy software from a variety of different

 4     companies.  And so I believe there's some documents from

 5     Immix.  I may be mistaken, but they're not -- they were

 6     not prominently involved.  They wouldn't have it -- the

 7     most relevant information about what was going on on the

 8     project.

 9          THE COURT:  They simply sell it; they don't

10     maintain it?

11          MR. O'BEIRNE:  That's my understanding, Your

12     Honor.  Again, I would want to check and I'd be happy to

13     get back to the Court.

14          THE COURT:  All right.  Well, last time we got

15     together I think was what, August, and every time we get

16     together, I ask the same question, do you know any more

17     than you did in terms of uses beyond what the

18     Government's willing to concede?

19          MR. O'BEIRNE:  Oh, Your Honor, we continue to

20     see evidence suggesting many more uses beyond what the

21     Government has conceded.

22          THE COURT:  And --

23          MR. O'BEIRNE:  We haven't even seen the core

24     SMS documents yet.

25          THE COURT:  And that -- at the risk of

4DD Holdings, LLC v. USA                                    10/4/2017

1    reopening all that, that's because -- you have not seen
2    the core SMS documents because?
3              MR. O'BEIRNE:  Right, Your Honor.  So as you'll
4    recall, the SMS lab was where a substantial amount of the
5    testing, at the Government's direction and with the
6    Government's oversight and with reports to the
7    Government, was going on, it was eventually a move of
8    some environments over to the Government DTC testing
9    center.  We understand potentially it moved back and
10   forth several times, et cetera.  What we received from
11   SMS with almost no real metadata were a spattering of
12   communications, et cetera, but not the core documentation
13   of what they were doing in their labs at the Government's
14   direction.  For example, Your Honor --
15             THE COURT:  I'm looking for the because.
16             MR. O'BEIRNE:  Well, because they've refused to
17   produce it in third party discovery and the Government
18   had not gone and gotten it.  I'll give you an example of
19   the kinds of information that we think are squarely
20   within --
21             THE COURT:  That's okay.
22             MR. O'BEIRNE:  Okay.
23             THE COURT:  Hopefully, that problem will be
24   addressed shortly.  What about on the second issue,
25   whether or not the Government was knowledgeable about any

 1    of those additional uses or authorized them.

 2          MR. O'BEIRNE:  Your Honor, we continue to see

 3    extensive evidence that the Government was directing and

 4    was being informed of the testing that was going to

 5    occur, given input, was directing and was given

 6    deliverables, had oversight, insights into what was going

 7    on in the SMS lab.  In part, the use remained in the SMS

 8    lab because the Government testing center wasn't ready

 9    yet and so the Government said, okay, just keep doing it

10    in your lab and then when the DTC is set up, then we can

11    move it there.  So we think the evidence is overwhelming

12    that everything that occurred in the SMS lab was

13    absolutely at the direction of the Government, with its

14    authorization and consent.

15          THE COURT:  Well, are you -- to what extent

16    would it be useful or are you able to comprehensively or

17    at least meaningfully respond to the motion to dismiss

18    therefor?

19          MR. O'BEIRNE:  We're certainly attempting to do

20    that as fast as we can, Your Honor.  Obviously, there's

21    been no deposition of the government witnesses and we

22    would want to explore that testimony with the documents

23    that we've obtained to date.  So, you know, Mr. Calvin's

24    deposition has been schedule and he obviously had a

25    leadership --

4DD Holdings, LLC v. USA                                    10/4/2017

```
 1            THE COURT:  Who is he now?
 2            MR. O'BEIRNE:  He was the contracting officer
 3   representative and the project manager for the DMIX
 4   project and was working hand in glove with SMS while they
 5   were working on the project in late 2013, all the way
 6   through 2014.  He has provided those series of
 7   declarations that -- the updated series of declarations
 8   indicating how many copies were potentially used or used
 9   but not configured or deleted, et cetera.  So we
10   absolutely have a lot of questions for Mr. Calvin based
11   on the documents we've seen and we think that --
12            THE COURT:  Is he the person that would be the
13   30(b)(6) on documents?
14            MR. TODOR:  On documents -- I don't know about
15   documents.  Probably not.  He would be the person on
16   installations.
17            THE COURT:  I thought you all had somebody
18   designated -- I thought you all had somebody designated
19   to be the documents 30(b)(6).
20            MR. TODOR:  We haven't designated anyone yet.
21   There hasn't been a notice yet.  Plaintiffs have stated
22   in their, you know -- in their joint status report they
23   intend to file a 30(b)(6) on document retention and
24   document production.  They haven't filed it yet.  We
25   haven't identified a witness yet.
```

4DD Holdings, LLC v. USA                                    10/4/2017

1              MR. MEYERS:  And, Your Honor, if I may speak to

2     that -- that point.  As we indicated in the joint status

3     report, there are a number of issues that have come to

4     light about the Government's failure to preserve

5     documents and we would send a 30(b)(6) -- I think the

6     parties' both reading of the Court's last order was that

7     depositions were not to occur --

8              THE COURT:  Mm-hmm.

9              MR. MEYERS:  -- until the Government produced

10    its documents, and that's a sensible ordering now sort of

11    thrown into disarray because the Government says we're

12    not going to be able to produce by the date that the

13    Court ordered.  But we'd like to take a deposition on the

14    30 -- the 30(b)(6) deposition on document preservation

15    and document destruction.  We'd like to do that in ten

16    days, because there are a number of serious issues, the

17    deletion of Denise Stokely's (phonetic) laptop.

18             There are a number of contractors -- SMS

19    returned 34 laptops to the Government that all had --

20    government-furnished equipment that were not preserved.

21    In other words, that were reimaged by the Government and

22    at a point in time where -- it looks like we had filed a

23    lawsuit so there definitely were preservation obligations

24    and there certainly were preservation obligations when

25    the Government deleted and reimaged Denise Stokely's

4DD Holdings, LLC v. USA                              10/4/2017

1    laptop.

2          We have an email that we reference.  It's in

3    Exhibit F to our motion to compel and it's relevant to

4    that issue, but it also underscores the number of

5    entities that had copies of TETRA.  She wrote -- she

6    wrote, you know, we can substantiate the existence of

7    TETRA software in our prior lab and she says she had a

8    TST file containing all emails referencing the virtual

9    machines that had TETRA on it.  So that was on a computer

10   that she handed over to the Government in response to a

11   government preservation order and the Government did the

12   opposite of preserving it.  The Government reimaged --

13         THE COURT:  Remind me, is she a third party?

14         MR. MEYERS:  She is.  She's a third party

15   contractor with KSJ.  And --

16         THE COURT:  Is this the one where it was

17   reimaged four days after the preservation request went

18   out?

19         MR. O'BEIRNE:  She had two laptops.  We've

20   gotten a limited understanding from KSJ.  Apparently, she

21   had two laptops.  One was turned back and she was given

22   another government-furnished laptop during the -- during

23   the open period of when she was working, you know, on the

24   government contractors.  She turned her old one in and

25   got a new one with the information.  The second one that

1    was turned back to the Government was apparently turned

2    back to the Government in late 2016, was only wiped two

3    months ago.

4              MR. MEYERS:  Yes, August 28th.

5              MR. O'BEIRNE:  2017.

6              MR. MEYERS:  2017.  So it was four days after

7    we had received an email from KSJ's counsel who's been

8    before the Court, Ms. Heischmidt, and we asked her about

9    this and she said, yes, Ms. Stokely returned that

10   computer to the Government.  And four days after that,

11   the Government wiped that computer clean and didn't

12   preserve it.

13             MR. TODOR:  Your Honor, that's -- okay,

14   Complainants are taking that sequence from I believe an

15   email we sent them updating them on what happened.

16   That's not our understanding of what happened.  Our

17   understanding is Ms. Stokely received the upgrade on the

18   laptop in -- on or about February of 2016 just to get a

19   faster laptop (inaudible) the work.  She turned it in in

20   November of 2016 because she had left KSJ, not in

21   response to the preservation order as Plaintiffs are

22   saying.  Our understanding is she did not flag for the

23   laptop management people, different people than the ones

24   who had sent her the notice to preserve document that,

25   you know, there may be responsive documents on it.

4DD Holdings, LLC v. USA                                    10/4/2017

1          In terms of the contents of documents related

2     to her, Plaintiffs got the email that they're referring

3     to from, I believe, an ICS-Nett production.  The ICS-Nett

4     contractors, as well as KSJ, as well as government people

5     were working together on the project.  It is very likely

6     that some or maybe a great deal of Ms. Stokely's emails

7     would have been either on the Government's email system

8     or on emails to or from other contractors or to and from

9     government employees.  For example, the email they sent

10    was to Joshua Zamarripa --

11          THE COURT:  Hang on, hang on.  Are you saying

12    that, therefore, even if it was wiped out, most of this

13    stuff is probably preserved elsewhere?

14          MR. TODOR:  There would have been other places

15    it could have been preserved, yes.  I don't have a

16    representation here as to how much there was and how much

17    was preserved, but we're saying that there's a good

18    chance that, you know, a portion of it is in other

19    places.

20          THE COURT:  Well, all right.  Are you telling

21    me that there's no reason to think that the word didn't

22    get out to preserve things both internally in the

23    Government and to the contractors?

24          MR. TODOR:  Yes, there's the litigation hold

25    that was sent both to government employees and to

1    contractors notifying them of the lawsuit and of the

2    preservation obligation.  There was also a requirement

3    for government people to -- and I believe some

4    contractors -- to report back as to whether they had

5    responsive materials in response to that.

6            Our understanding is when Ms. Stokely turned in

7    the laptop, not as part of the preservation order, but as

8    part of -- because she was leaving, she did not

9    specifically flag, you know, hey, there could be

10   responsive documents on this laptop and she turned the

11   laptop in to the people who processed it.  However, we

12   believe that since she is emailing back and forth with

13   other contractors who produced responsive materials,

14   including the email we're talking about and with

15   government employees, that we could search the

16   Government's email system for documents either to or from

17   Ms. Stokely or, you know, any records in Ms. Stokely's

18   account where we could certainly in PST, as an Outlook

19   email file, where we could produce whatever we have in

20   terms of emails involving Ms. Stokely.

21           THE COURT:  Is there any reason not to go ahead

22   and do an initial 30(b)(6) deposition on the

23   understanding that if it turns out -- if the facts

24   warrant having another one later, we could do that?

25           MR. TODOR:  Well, the -- first, the question is

4DD Holdings, LLC v. USA                                    10/4/2017

1   whether the Court, you know, wanted the depositions to

2   occur -- if the Court wishes for the deposition to occur

3   before all the document production is completed, then,

4   you know, we'll move forward on that basis.  In terms of

5   preparation for the deposition, Plaintiffs were talking

6   about a ten-day turnaround.  We are, you know, very

7   actively engaged in trying to turn around Plaintiff's

8   most recent round of email requests.  This would be going

9   on during that time and would be -- would impair both the

10  preparation of the witness and, you know, our ability to

11  produce the emails the Plaintiffs are talking about.

12          THE COURT:  Well, who do you have in mind to be

13  responsive on a deposition like that?  Is there a single

14  person?

15          MR. TODOR:  Well, that's the other problem.  So

16  we have two physical locations where people were involved

17  with this.  There was the location -- I believe people

18  were in Rosslyn, in Arlington, who were involved in

19  production on the DHA system.  After the DTC system was

20  ran down, what became that system or that center -- those

21  functions were moved to San Antonio.  So there was --

22  there would be separate people in San Antonio who were

23  involved in the production of those documents.

24          THE COURT:  When did that happen?

25          MR. TODOR:  That was with -- I believe with the

1    decommissioning of the DTC Richmond facility, which

2    occurred in September or October of 2015.  Those

3    functions were transferred to San Antonio.

4            THE COURT:  Why was stuff transferred in bulk

5    over to West Virginia?

6            MR. TODOR:  That's a different process.  So DHA

7    processes were transferred to San Antonio, the health

8    care.  The West Virginia facility they're talking about

9    is the Allegany Ballistics Lab.  So there were hard

10   drives created from the DTC servers that had software one

11   would use to operate a server system, not necessarily

12   connected to health care.  Those hard drives were used to

13   transfer those -- that software to the West Virginia

14   facility.

15           So if the Plaintiffs are asking for, you know,

16   document retention, there was no work done on, say,

17   developing TETRA that we're aware that could have been

18   going on in the West Virginia facility or in the San

19   Antonio facility since they -- you know, part of the

20   reason it was transferred to San Antonio was they had

21   decided not to move forward with the integrated

22   electronic health record system that, you know, they were

23   using the TETRA software, so there was no use for it

24   after that.  That's why there was the true-up and, you

25   know, people went on.

4DD Holdings, LLC v. USA                                    10/4/2017

1          But there were responsive documents produced,

2     you know, Plaintiffs had from individuals who were not

3     working in San Antonio such as Ms. Stokely or Mr.

4     Zamarripa, the chief engineer down there --

5          THE COURT:  I'm sorry, down -- he was where?

6          MR. TODOR:   In San Antonio.  But he wasn't

7     working on the Richmond project that at least I know of

8     at this point.  But those functions were transferred to

9     San Antonio.

10         THE COURT:  Well, I've seen a number of emails

11    involving Mr. Zamarripa.  Why would he be involved in it

12    if the TETRA-related activities ended when DTC

13    transferred that function?

14         MR. TODOR:   Because Plaintiff's document

15    requests span from January 1st, 2012 to the present and

16    the individual they're talking about, Ms. Stokely, a KSJ

17    employee, Mr. Zaparippo, you know, right before, he was

18    the one telling her, yes, you have this preservation

19    obligation because when Plaintiffs filed the lawsuit, the

20    functions have been to San Antonio.

21         THE COURT:  So his function is purely

22    contemporaneous and not at the time TETRA was in use?

23         MR. TODOR:   That's our understanding at this

24    time.  We haven't interviewed him on whether he was

25    involved in any technical development.  But in terms of

4DD Holdings, LLC v. USA                          10/4/2017

1    the document retention piece of the puzzle, he was the
2    one that -- as far as we know, telling people, hey, this
3    lawsuit has been filed, now it's 2016, so not when the
4    work was being done.  But this lawsuit's been filed, we
5    have this preservation obligation.  He was the one
6    telling people to do that.
7                THE COURT:  So who is in a position to decide
8    when computers get reimaged or files get shredded and
9    that kind of thing?  Is there one single relevant point?
10               MR. TODOR:  Which computers is the Court asking
11   about?
12               THE COURT:  Well, all right, I'm on the status
13   report, page 1.  The Government's preservation and
14   production of files from the government-furnished
15   computers, I assume these are computers furnished to
16   third parties during something --
17               MR. TODOR:  Okay.
18               THE COURT:  -- that's relevant to this lawsuit.
19               MR. TODOR:  These are laptops that were issued
20   to -- issued or the Government gave the contractor money
21   to buy laptops for employees to use on the project.
22               THE COURT:  Okay.  Those laptops.
23               MR. TODOR:  What the Plaintiffs called
24   government-furnished equipment.  Those laptops, we
25   investigated -- so we talked to the people in Rosslyn, we

4DD Holdings, LLC v. USA                                    10/4/2017

1   talked to the people in San Antonio.  Is there a written
2   policy for whether you keep an archive for that?  No.  We
3   asked them whether they have any records of who the
4   laptops were issued to, when did they get them, what did
5   they do with them.  They've gathered that.  They told me
6   that they did not have a policy, and the records indicate
7   that they did not, keep an archived copy of the laptops
8   when they came in.

9         They did have a record of having issued the
10   litigation hold to the employees or to the companies that
11   had employees using the laptops, they did not keep --
12   take a copy when they were turned in.  They were turned
13   in to a different center of the people who manage the
14   laptops not the PNs on the project or what have you.  So
15   there was different people involved.

16         Our understanding is that they did not keep a
17   copy of the laptops when they were turned in, but if the
18   laptops were used, as is often the case, on the
19   government systems, then records of what was being done
20   with the laptops, such as emails, documents being sent
21   very well may be on the government system either as
22   records in their own, an account of that person, or
23   emails to or from other people or to the government
24   employees involved.

25         THE COURT:  So laptops were used by

4DD Holdings, LLC v. USA                                    10/4/2017

1    contractors, turned back in to DHA.

2              MR. TODOR:  Yes.

3              THE COURT:  And there was a preservation order

4    in place when those laptops were purged?

5              MR. TODOR:  Yes.

6              THE COURT:  Why did they get purged?

7              MR. TODOR:  Our understanding is the IT

8    personnel handling it didn't interpret it as those being

9    government documents to be kept.  They just reimaged them

10   or, you know, kept them, and then in cases they were

11   issued to other employees.  We asked the people -- the

12   more senior people involved why this occurred.  They

13   didn't have an answer beyond they didn't view them as

14   government documents; they viewed them as things that the

15   third parties were using.

16             THE COURT:  So is that likely to continue to

17   happen in the future?

18             MR. TODOR:  We hope not.  I instructed them not

19   to do that.  I instructed them, you know, going forward,

20   if something comes in -- if anything else comes in and I

21   instructed them to find out if there were any that still

22   had responsive material on them.

23             MR. MEYERS:  Your Honor, may I comment on that?

24   So we went back -- we were reviewing correspondence that

25   Mr. Todor had with prior counsel for Plaintiffs, and in

1    May of this year, before we came in, he had an exchange

2    with prior counsel -- the Government had an exchange with

3    prior counsel about SMS laptops because, apparently, it

4    emerged that SMS had returned 34 laptops, and 19 of

5    those, at least, were returned after the Government --

6    after we had filed -- our clients had filed the suit.  So

7    certainly, preservation obligations were required at that

8    point.

9            The Government reimaged all 34 of those laptops

10   and didn't preserve any of that data.  And Mr. Todor

11   assured prior counsel that he had instructed his client

12   to change the process.  And I'm sure he did.  I'm not

13   doubting that he gave that instruction.  But then we

14   learn that the Government wasn't following that

15   instruction because Ms. Stokely's computer was reimaged,

16   even though the Government had told her there's an

17   evidence preservation obligation that applies to your

18   data.  And the Government reimaged that this past August.

19           So we're really concerned -- and this is why we

20   think we needed the 30(b)(6) and we need it very soon,

21   because if Mr. Todor at the Justice Department is

22   advising the Defense Health Agency personnel to preserve

23   data, the message is not getting through and we need to

24   find out what's going on.  And depending on what we find

25   out, we need to come back to this Court so that, you

4DD Holdings, LLC v. USA                                    10/4/2017

1    know, appropriate measures can be taken and whatever

2    consequences of what has been lost and what can be

3    recovered can be hammered out.  We just can't sit back

4    and rely on these sort of assurances anymore from the

5    Government.

6              THE COURT:  Okay.  When I suggested a sort of

7    interim 30(b)(6), you're saying that conflicts with this

8    massive email review.  Well, two things, one, it sounds

9    as if we need to do an interim 30(b)(6) for one or more

10   people with respect to current document production and

11   retention issues, number one.

12             But, number two, your concern about the volume

13   of emails, I'm willing to entertain that problem, but my

14   suggestion would be that we don't need to resolve that

15   before we have an interim 30(b)(6).  I'm more concerned

16   given the possibility of spoliation in the recent past

17   and the frustrating nature of trying to figure out sort

18   of basic information here that it's best to go ahead and

19   move forward irrespective of the email problem and

20   without prejudice to the Plaintiff's ability to take a

21   different deposition down the road, if necessary.

22             But on the emails, I believe you indicated that

23   if we had narrower search terms for that pile of stuff,

24   we might be able to isolate more responsive emails.  Is

25   that right?

4DD Holdings, LLC v. USA

1          MR. TODOR:  Yes.  And the two terms that we

2    noted in their search terms "core" and "port," you know,

3    could be -- appear in a lot of range of documents that

4    wouldn't necessarily be focused on this case.

5          THE COURT:  So where does that stand?

6          MR. MEYERS:  Your Honor,  we told Mr. Todor

7    that we were open to discussing that, but we need more

8    information.  We haven't gotten the -- like sort of an

9    analysis of like here are your terms and here are the

10   number of hits so we could see what the problem children

11   are there.  Without that, it's hard for us to --

12         THE COURT:  Hang on.  Does that exist?

13         MR. TODOR:  Not yet.  I've instructed the IT

14   contractors retained for the case to do that.  They

15   haven't done it yet.  They're expected to have it by the

16   end of the week.

17         THE COURT:  Are they able to say the reason you

18   got 700,000 is because they had the word "X" in it?

19         MR. TODOR:  Our email review software, you can

20   search for a term and you can get the number of hits you

21   get in response to a term.

22         THE COURT:  Okay.  Well, I don't know how long

23   that will take or how long it would take to rerun the

24   production.  So a database exists with roughly 800,000

25   emails that can be now manipulated to a smaller number?

4DD Holdings, LLC v. USA                              10/4/2017

```
 1              MR. TODOR:  Our understanding is there were
 2    about 850,000 pages and about half of what was to be
 3    loaded.  So it would be about 1.7 million pages total.
 4    Our understanding was somewhere in the neighborhood of
 5    300,000 documents.
 6              THE COURT:  What do you want to move forward
 7    with skinnying down the request first or do your 30(b)(6)
 8    on document production?  I don't care, but I think -- I
 9    think I would expect you all to negotiate that decision
10    sooner rather than later.  I guess what -- in effect,
11    what I'm ordering is that I will allow the Plaintiff to
12    do a 30(b)(6) on this, and potentially other issues, on
13    an ongoing basis, if necessary, to figure out what's
14    going on with the documents.
15              But it might make sense if Mr. Todor can
16    generate a means for narrowing that search and if that
17    search can be done in short order before you depose
18    somebody, it might make sense.  But I won't require it.
19              MR. MEYERS:  Thank you, Your Honor.  I think we
20    envisioned this in parallel because I think that our view
21    of the need for the 30(b)(6) was more on the
22    preservation, retention and destruction of documents as
23    much as -- not as much as the --
24              THE COURT:  Well, let me interrupt.  I'm sure
25    the Plaintiff has a legitimate reason for pursuing that
```

4DD Holdings, LLC v. USA

4DD Holdings, LLC v. USA                                    10/4/2017

1    in discovery, but I view that as an attorney issue from

2    your side.  I'm taking you at face value that the

3    instruction is out there.

4            MR. TODOR:  We repeated it.  And to clarify

5    with respect to the discussion of May, we sent the --

6            THE COURT:  Mm-hmm.

7            MR. TODOR:  -- the instruction in May, we were

8    in contact with the people in Rosslyn who were managing

9    the SMS laptops and those are the people I had this

10   specific conversation with.  There were people in San

11   Antonio who, now that this issue has come to light, I've

12   learned about that, you know -- you know, when I wrote to

13   Plaintiffs about the issue.  So I had not been alerted to

14   or have not had the same conversation with the people in

15   San Antonio that I had had with the people in Rosslyn

16   when I notified them of the issue.  But, now, I've

17   repeated the instruction to the people in San Antonio and

18   have asked them to track down whatever there is.

19           THE COURT:  Well, all right.  It's hard for me

20   to assess the likely results you're going to get.  But

21   I'm assuming that somebody with some imagination has been

22   told on the part of the agency, this cannot happen.  And

23   if it does, then the agency is going to suffer the

24   consequences in terms of spoliation penalties in terms of

25   evidentiary proofs or whatever down the road.

4DD Holdings, LLC v. USA                                    10/4/2017

1          So whatever it takes to get that message out
2     there.  I'm not saying that it's not -- the Plaintiff
3     can't pursue what the cock-up was the first time around,
4     but I'm more concerned that it doesn't repeat itself.
5     And so you've told me that that message is out there;
6     I'll just take that at face value.

7          Do you know yet what you want to do?
8          MR. MEYERS:  Your Honor, I'll confer with my
9     clients, but I suspect we'll want to proceed now with the
10    30(b)(6) on document preservation and destruction.
11         THE COURT:  Okay.
12         MR. MEYERS:  And we will, in parallel, work
13    with the Justice Department to try and narrow these
14    terms.  I do want to emphasize, Your Honor, we asked for
15    these custodians in July and then Your Honor ordered the
16    Government, on September 11th, to produce -- finish the
17    production by October 13th.  We haven't gotten a single
18    document from any of these additional five custodians
19    yet, and we only learned from the Government for the
20    first time this past Thursday that they haven't started
21    reviewing the documents, we've got too many.  So we'd at
22    least like a rolling production.

23         I mean, I think search terms are a useful
24    approach, but they are other means of identifying
25    responsive documents and just getting them out the door,

4DD Holdings, LLC v. USA                                        10/4/2017

1    and the Government hasn't done any of that yet.  So we're

2    happy to work with them to try and narrow the terms, but

3    we do think that in parallel, it can't be an either/or

4    thing.  The Government needs to be able to start rolling

5    productions of responsive documents.

6              THE COURT:  Well, unless I'm missing something,

7    I don't think I'm going to require that.  You're telling

8    me you're confronted with 850,000 pages, probably twice

9    that from the current search.

10             MR. TODOR:  Yes.

11             THE COURT:  Is -- I think counsel's suggestion

12   is if there's another way to approach that heap of paper

13   that will allow you to start producing some of it now.

14             MR. TODOR:  I'll -- well, as I communicated to

15   Plaintiff's counsel when we conferred last Thursday -- or

16   Friday, the documents are basically in three tranches.

17   And we have -- and they're by the email system that was

18   being searched.  The email system for Department of

19   Defense, the main one that was a new system instituted

20   from 2015 onward, had -- there were about 11,000 emails

21   from that search.  That will be the easiest to search,

22   but also not the ones from the active phase of this

23   project.

24             The second tranche of roughly 850,000 pages,

25   that is from the Department of -- the Defense Health

1    Agency legacy system, probably the most pertinent to the

2    case.  My suggestion would be that we refine the search

3    terms for that database, and then on a rolling basis, we

4    could get those out the door sooner than if we had the

5    second half of this, which is basically from one

6    custodian, Chris Miller, who is a senior executive

7    service official.  He was on the Defense Health Agency as

8    a director -- as the -- as a detail.  But his main

9    function is at the Space Weapons Research Institute in

10   South Carolina.  He had another email there.  There were

11   146 gigabytes in that production, but those are much less

12   likely, it would appear, to be pertinent to this case

13   because those are, by definition, not the ones when he

14   was working at DHA.

15          So in terms of streamlining the process, we'd

16   propose that we review the ones -- the 11,000 set first,

17   then the narrowing down of the terms for the DHA legacy

18   set.  Ideally, we can get something where we can move

19   that out more quickly and do the ones from the South

20   Carolina Space Center one last.

21          THE COURT:  All right.  I'm back where I was.

22   I haven't heard anything that makes me think that there's

23   anything to be gained by not going through that drill.

24   But what I'm not doing is simply deferring until December

25   the obligation to produce whatever is responsive.  I'm

4DD Holdings, LLC v. USA                              10/4/2017

1     not saying it has to be done by -- what is it -- October

2     13th?

3               MR. MEYERS:  That's in the current order, yes.

4               MR. TODOR:  That was the Court's order, yes.

5               THE COURT:  I guess I'd rather reconvene by

6     telephone in a couple of weeks to find out what's going

7     on.  I guess what I'm assuming is that in the next couple

8     of weeks that that first, most useful tranche of material

9     you alluded to for the right time period would be

10    searched based on a narrower set of search terms.  And

11    what I'm looking for is a quick production of that

12    material.

13              And then, depending on what kind of results you

14    get and how long that takes, realistically, you can

15    propose what to do with those other two tranches of

16    material to search.  But that's not a license to simply

17    run this out until December.  So I'd like to reconvene in

18    a couple weeks after you all -- after Plaintiffs present

19    that narrower set of terms, the Government runs it in

20    that first group of material, and let's see what kind of

21    results you get.

22              The second item was email custodians.  Now,

23    what's that about?  You have five custodians, right?

24              MR. MEYERS:  So we have asked for five

25    additional custodians and those are the emails that we

4DD Holdings, LLC v. USA                                    10/4/2017

1    have been discussing.

2              THE COURT:  Which are the first --

3              MR. MEYERS:  The first ones are the documents

4    that the Government has produced today.  So for the --

5    the Government has produced emails from the five

6    custodians and then there's --

7              THE COURT:  This group that we've been talking

8    about, these three different tranches, 1.6 million pages,

9    whatever, we're talking about that second group now?

10             MR. MEYERS:  Yeah, the second find, yes.

11             THE COURT:  So the first -- the batch

12   responsive to the first five custodians has been

13   produced?

14             MR. MEYERS:  It has been produced and that's

15   what -- we're in the process of reviewing that.  I think

16   from a review of those documents, as well as the

17   smattering of third party documents -- and we've told Mr.

18   Todor this -- we've identified some additional custodians

19   on top of the second set -- second five that we think

20   need to be produced, and we're formulating that list and

21   we'll share that with the Government and confer with them

22   on the timetable for the production of those documents.

23             THE COURT:  Hmm, okay.  Is that likely to be

24   amended, reduced, expanded after the 30(b)(6)?

25             MR. MEYERS:  Well, I don't know, Your Honor.

4DD Holdings, LLC v. USA                                    10/4/2017

1    Honestly, I don't know.  I would like to be able to tell
2    the Court --
3              THE COURT:  Okay.  Well, as I said, let's
4    reconvene in two weeks.
5              Access to the encrypted hard drives.  Are these
6    hard drives different than the ones we were talking about
7    earlier?
8              MR. MEYERS:  No, it's the same ones, Your
9    Honor, and it's the ones that you had ordered the
10   Government to either direct an employee of the Government
11   or request a contractor to assist us with accessing.  And
12   the Government did not direct a government employee to
13   assist us with accessing.  As I understand it from Mr.
14   Todor, the Government asked a company called MicroHealth
15   and MicroHealth has said it would need some sort of
16   contract modification.  So we haven't been able to access
17   these hard drives.
18             THE COURT:  Well, tell me what universe of hard
19   drives we're talking about if they're not the ones --
20             MR. MEYERS:  Sure.
21             THE COURT:  -- that were turned back in by all
22   these contractors.
23             MR. MEYERS:  So these are -- these are not
24   laptops.  These are -- Mr. Todor alluded to it, which is
25   also an issue with the preservation and spoliation

4DD Holdings, LLC v. USA                                10/4/2017

1    issues.   The Government decommissioned the Richmond

2    Development Testing Center, the DTC, in -- I think Mr.

3    Todor said here today September or October, which is what

4    we had thought, after we had filed suit.   So the first

5    question of evidence preservation.

6            What we understand is that the contents of the

7    DTC was put on these hard drives that were meant to serve

8    as the way to transfer those contents to the Allegany

9    Ballistics Lab.

10           THE COURT:   Strictly for archiving?

11           MR. MEYERS:   I don't think it's strictly for

12   archiving.   I think it was a means of trans -- of moving

13   data from the DTC, which was being decommissioned, to the

14   Allegany Ballistics Lab.

15           THE COURT:   So do you know what happened to the

16   original material?

17           MR. MEYERS:   I don't.   I mean, that was

18   something we want to ask the 30(b)(6) on document

19   preservation.

20           THE COURT:   Was that strictly copying or was it

21   copying and deletion?

22           MR. TODOR:   The person we spoke to said that

23   the hard drives were not meant to be a permanent record,

24   they were meant to transfer, because these are six

25   terabyte hard drives, huge volumes of data.   These are

1     very large, you know, applications that are meant to

2     transfer to the server, you know, in the ABL.  Some

3     portions of them may have been copied over or used for

4     other things.  He wasn't sure what.  We're looking for

5     records on -- if there is anything on that.

6                THE COURT:  Well, hang on.  Are you talking

7     about the originals might have been copied over in part

8     or the copies that were sent to West Virginia?

9                MR. TODOR:  The hard drives were -- had things

10    from Richmond put on them.  That was taken to West

11    Virginia.  Those things were put on West Virginia.  There

12    may have been other things that needed to be put on those

13    hard drives to continue to take it to West Virginia.

14    Portions of it may have been erased, other stuff put on,

15    and then that taken over to West Virginia and put on in

16    West Virginia.

17                THE COURT:  I'm still not sure what happened to

18    the original data.  Was it merely copied or was it

19    transferred?

20                MR. TODOR:  So it was copied from the servers

21    in Richmond.

22                THE COURT:  So the original --

23                MR. TODOR:  So there were some images of the

24    Richmond servers were some of the files on these hard

25    drives, which is why we viewed them as responsive

4DD Holdings, LLC v. USA                                    10/4/2017

1    documents and produced them.

2              THE COURT:  What --

3              MR. TODOR:  But --

4              THE COURT:  If the original material is still

5    there in whatever is left of DTC in Richmond, why do we

6    need these other hard drives?

7              MR. TODOR:  Okay.  The Richmond facility was

8    decommissioned because they decided to close the

9    facility.

10             THE COURT:  Mm-hmm.

11             MR. TODOR:  So ABL said, well, we need some of

12   this software, they transferred it there.  Functions of

13   DHA were in San Antonio (inaudible) because they ended

14   the project to develop the software that the (inaudible)

15   are using here.  Those physical servers, I was informed,

16   were wiped, were transported to San Antonio.  Some of

17   them were actually damaged in transit to San Antonio.

18   But the -- they wouldn't have had any data at the time

19   they were being transported.

20             Also, I've been informed by everyone I've

21   talked to that the --

22             THE COURT:  They wouldn't have any data.  That

23   means it wasn't copied, it was transferred to these hard

24   drives.

25             MR. TODOR:  It was copied to the hard drives,

4DD Holdings, LLC v. USA                                    10/4/2017

1    transferred.

2              THE COURT:  Yes.

3              MR. TODOR:  Later, the original servers wiped,

4    transported to San Antonio.

5              THE COURT:  I see.

6              MR. TODOR:  Everything we've been informed is

7    that the original servers -- there have been several

8    change orders -- Plaintiffs have brought these up before

9    -- to delete all instances of TETRA from these servers in

10   the fall of 2014.  The last one, I believe, was issued in

11   January 2015.  The decision to decommission the Richmond

12   facility, I believe, occurred in May or June of 2015 and

13   that process was completed, I think, in September or

14   October of 2015.

15             I understand from everyone we've talked to

16   that the TETRA software would not have been on those

17   servers at the time those hard drives were created to

18   transfer things to West Virginia.  Nevertheless, because

19   they had images of the Richmond servers and may be the

20   only ones, you know, that are available, we viewed them

21   as responsive documents and produced them to Plaintiffs.

22             THE COURT:  And how many of these hard drives

23   are there?

24             MR. TODOR:  I believe there are six.  There

25   were seven, but I believe one was physically damaged so

4DD Holdings, LLC v. USA                                    10/4/2017

1    they couldn't access the data on that.

2                THE COURT:   How do they organize themselves?

3                MR. TODOR:   Hmm?

4                THE COURT:   How are they organized?

5                MR. TODOR:   One was in the file cabinet of --

6                THE COURT:   No, I mean, what's on them?   I

7    mean, why did it take six extremely large hard drives to

8    copy all this stuff?

9                MR. TODOR:   Basically software you'd use to run

10   a server.   Microsoft software was the main component from

11   the file listing that I saw.   There were also some

12   applications you'd use to operate in a server

13   environment.   I was told that some of those applications

14   were also transferred to --

15               THE COURT:   Are there indices to --

16               MR. TODOR:   -- West Virginia.

17               THE COURT:   -- these hard drives?

18               MR. TODOR:   There were that we produced to

19   Plaintiffs with kind of a top-level listing of what's on

20   them.   But in terms of accessing them, actually to fire

21   them up and see what's on them, no government employee

22   had that information.   The contractor had done it before

23   using the same passwords and instructions that we had

24   given the Plaintiffs.   That was the person we requested

25   to appear per the Court's order.

4DD Holdings, LLC v. USA                                    10/4/2017

1          The response we got from that contractor, who
2     was now under a different prime contractor, was they need
3     to check with the prime contractor.  The prime contractor
4     said, well, it doesn't appear within the scope.  We're
5     having a contracting officer determine whether it's in
6     scope.  But the larger problem there is the subcontractor
7     employee, they represent to us, doesn't have any more
8     information than what we've given the Plaintiffs in terms
9     of instructions of how to do it.  Therefore --
10          THE COURT:  Well what's the point of this
11     exercise if this information is now inaccessible?
12          MR. TODOR:  There are images of those original
13     servers on at least some of the hard drives.
14          THE COURT:  Yeah, that's my question.  What was
15     the point of copying all that stuff to these separate
16     hard drives if nobody could access them?
17          MR. TODOR:  Well, there was -- there was
18     encryption placed on them to protect them.  There were
19     passwords and instructions for how to do it with the
20     passwords for the encryption.  Our understanding was that
21     would be enough to access them and that had been done
22     before.  So it's not meant to be inaccessible, it's meant
23     to be accessed with the passwords that, you know, we
24     have.
25          THE COURT:  Which don't appear to work.

```
 1              MR. TODOR:  Which -- yeah, we were told by
 2      Plaintiffs didn't work.  I've instructed the IT
 3      contractors we've retained for this case to see if it
 4      works, if we can get it to do it ourselves.  We have also
 5      spoken with Plaintiffs about this and Plaintiffs have
 6      reached out to ICS-Nett, the contractor that actually
 7      originally apparently made these hard drives and placed
 8      the encryption on in the first place, to see if they can
 9      straighten it out.
10              THE COURT:  You've looked at the indices to all
11      these hard drives?
12              MR. MEYERS:  We have.  I don't think they're
13      all that informative.  But there is certainly some -- I
14      think the big question is, given the volume of data, it
15      can't be that all they had was sort of the operating
16      software for a server.  It has content on it.  And we
17      think that that content was the actual content in the DTC
18      and we'd like to analyze that to see if there's TETRA in
19      there or if there's evidence of how much TETRA was in the
20      DTC before the Government secretly deleted that -- those
21      copies of TETRA without telling our clients.
22              THE COURT:  All right.  So 2014, an order goes
23      out, eliminate all copies of TETRA?
24              MR. MEYERS:  Yes.  Yeah, September -- I think
25      September 2014 was the first change order that was sent
```

4DD Holdings, LLC v. USA                                    10/4/2017

1    out.  Our clients, a few days before, had said --

2              THE COURT:  Well, whatever.  The transfer to

3    these hard drives occurred thereafter?

4              MR. MEYERS:  Right.  I think we understand that

5    the transfer to these hard drives occurred sometime in

6    2015.

7              THE COURT:  So what makes you think that the

8    order to eliminate all TETRA somehow missed something?

9              MR. MEYERS:  Well, we don't know.  I mean, I

10   think that -- A, we think that -- we're interested in

11   trying to look at the data to see does the data show how

12   much TETRA was on there.  It's pretty hard to delete

13   things permanently and not be able to recover.  You

14   really have to work at it.  And so we'd like access to

15   the data that was imaged on these servers to be able to

16   analyze it and be able to see if we can figure out the

17   extent of TETRA that was on the DTC.

18             MR. O'BEIRNE:  And we --

19             MR. MEYERS:  I'm sorry, go ahead.

20             MR. O'BEIRNE:  I'm sorry, if I may add one

21   other point, Your Honor.  It was not one change order.

22   They were sequential.  The first said delete it here, but

23   not there.  And then there was follow-up change orders,

24   okay, now delete it every place, and then there was

25   confusion among the contractors.  Well, should we delete

4DD Holdings, LLC v. USA                    10/4/2017

1    it over here?

2         In the documents, the correspondence we've

3    already seen, we think it's very likely that they might

4    have intended to delete it and not fully deleted it or

5    the logs and the other kinds of information would exist

6    on there with what was done at what various times.

7         Secondly, Ms. Stokely's emails in our motion

8    are a perfect example.  The preservation hold went out

9    and people at KSJ said, oh, no, we don't have any

10   information about the DTC.  And she says, I'm obliged to

11   tell you I have an entire TST file with -- documenting

12   everything that happened in the DTC.  So we've already

13   seen where some people with some responsibility on the

14   project would say, oh, no, wait a minute, we deleted all

15   of it.  Well, it turns out, never mind, no, we didn't,

16   it's still here on the server, et cetera.  So that's why

17   we want to get into the documents.  We want to get into

18   the hard drives, Your Honor, to see what's on there,

19   because we think there's reason to believe it would be

20   there.

21        THE COURT:  All right.  In terms of -- assuming

22   there's access, Mr. Todor, do you have any problem with

23   the Plaintiff simply accessing this onsite as opposed to

24   copying it?

25        MR. TODOR:  We provided Plaintiffs with

4DD Holdings, LLC v. USA                    10/4/2017

1    forensic copies of those same hard drives.  So there's no

2    site in Richmond for them to look at anymore.  So --

3              THE COURT:  I thought the stuff was all on West

4    Virginia.

5              MR. TODOR:  So West Virginia -- the -- so West

6    Virginia, you know, I don't know what is in West Virginia

7    other than what I've been told by the people who, you

8    know --

9              THE COURT:  So you're telling me that if the

10   Plaintiffs can crack these things, it's no concern to the

11   Government either in terms of expanse of time or

12   anything, Plaintiffs can evaluate to their heart's

13   content if they can get into it?

14             MR. TODOR:  Yes, although we did produce it

15   with the proviso that, you know, if there are things that

16   are, you know, later determined to be subject to

17   attorneys' eyes only designation, we would reserve the

18   right to do that later.

19             THE COURT:  Right.  Okay, so how --

20             MR. TODOR:  We would produce it under that

21   designation because their consultants are looking at it.

22             THE COURT:  So the only issue is access.  And

23   so what's it going to take to resolve the question of

24   whether or not the Plaintiff's code really works or not?

25             MR. TODOR:  So we are proceeding on three

4DD Holdings, LLC v. USA                          10/4/2017

1    fronts.  One is we're -- we asked that's the contractors

2    we retained for the litigation at DOJ to see if the codes

3    work.  Second is we've asked the --

4              THE COURT:  Well, how long will that take?

5              MR. TODOR:  They haven't told me.

6              THE COURT:  I mean, I can't imagine -- it's you

7    sit down at a computer and type in a password, right?

8              MR. MEYERS:  Our vendors told us within like 24

9    hours that they couldn't access these, so -- this has

10   been going on for weeks, Your Honor.

11             THE COURT:  Mm-hmm.

12             MR. TODOR:  This is the same contractors who

13   are processing the emails for us now, so I put a lot on

14   their plate and, you know, put this on their plate

15   specifically because of this issue in the JSR.  They

16   haven't given me an estimate for how long it's going to

17   take them to figure that out.

18             THE COURT:  Well, let's prioritize this one

19   little question of access.

20             MR. TODOR:  Okay.

21             THE COURT:  Above the email question.

22             MR. TODOR:  Second was we are -- you know, we

23   instructed -- we've asked DHA, have the contracting

24   officer rule on whether this is within scope for this

25   subcontractor to do.  Third, since the subcontractor was

4DD Holdings, LLC v. USA                                    10/4/2017

```
 1    saying --
 2            THE COURT:  To try to sit down and access it?
 3            MR. TODOR:  To -- the Court's order from
 4    September 11th contemplated that we request a contractor
 5    to go to Plaintiff's IT contractor's facility and
 6    basically try to assist them onsite.
 7            THE COURT:  Mm-hmm.
 8            MR. TODOR:  That's what we requested.  And that
 9    was what the contractor was saying, well, we don't think
10    that's in the scope.  We've asked the government
11    contracting officer to determine whether that's in the
12    scope.  If not, we'll, you know, work from there.
13            Third is Plaintiffs have reached out to ICS-
14    Nett, the company that made these -- made the encryption
15    on these initially to see if they can assist both parties
16    in accessing -- you know, we have an interest, we want to
17    know if Plaintiffs go into these things and say, oh, we
18    found, you know, a bunch of copies of this software, you
19    owe us money, obviously, we need to be able to confirm
20    that ourselves.  So we want to make sure we're having the
21    same ability to access them that the Plaintiffs have.
22            THE COURT:  Which, to me, suggests that whoever
23    it is that you're dealing with shouldn't be charging any
24    additional amount unless, perhaps, it's a trip to
25    wherever Plaintiff's facility is.  But it looks to me
```

4DD Holdings, LLC v. USA                              10/4/2017

 1    like this would be a fairly simple thing to decide

 2    whether or not the code works -- the access code works.

 3    So I'm assuming that will be prioritized.

 4             And if the Plaintiff gets access through ICS in

 5    the meantime, I assume you will tell the Government.

 6             MR. MEYERS:  Yes, we've copied Mr. Todor on our

 7    email correspondence with ICS-Nett's attorneys.

 8             THE COURT:  Search for Plaintiff's software at

 9    Allegany Ballistics Lab.  Are these the same hard drives

10    we're talking about?

11             MR. MEYERS:  Well, I think it's the -- the data

12    that was transferred off of the hard drives and then put

13    into ABL and then I think -- we don't know what was done

14    in the Allegany Ballistics Lab with what was on those

15    hard drives.  We've seen references in a number of

16    project documents that contemplated work being done in

17    the ABL.  And so, you know, as we were saying, we can't

18    sort of trust that there was no -- there were no more

19    copies of TETRA given --

20             THE COURT:  All right.  If what your concern is

21    is whether or not ABL has done something with the

22    material that was on the hard drives and then spawned a

23    whole new generation of TETRA out there somewhere, that

24    won't be a problem if it turns out there's nothing on the

25    hard drives.

4DD Holdings, LLC v. USA                                10/4/2017

1          MR. MEYERS:  So I think sequencing these makes
2     sense, yes.
3          THE COURT:  Right, right, okay.
4          MR. MEYERS:  If that's what -- yes, we would
5     agree to that.
6          THE COURT:  What is ICS-Nett laptops?
7          MR. MEYERS:  Your Honor, these are, I think,
8     related to the -- one of the issues we've been talking
9     about.  These are government-furnished equipment, so it's
10    government laptops.  And we had talked with Your Honor
11    about this last time and the -- I think what you had
12    directed the parties to do, which is what the Government
13    had asked, was for ICS-Nett to identify the responsive
14    documents and then the Government would copy them.  The
15    problem and issue is that because this is government-
16    furnished equipment, ICS is still using these laptops for
17    other government projects.  But ICS-Nett can't search the
18    laptops, they can't copy things off the laptops because
19    it's the government.  The equipment has some kind of
20    lock-down aspect.  So --
21         THE COURT:  Are we talking about laptops that
22    have remained in ICS's possession throughout this whole
23    period?
24         MR. TODOR:  Yes.  And so it's government-issued
25    laptops that ICS is using, used and contains responsive

1    materials about DMIX and TETRA and all the issues in this

2    case.  But ICS has continued using these laptops for

3    other of its government work.  So we served a subpoena --

4    we absolutely think that these are the -- the data that's

5    on these laptops should be part of Your Honor's ruling on

6    the motion to compel and that the Government should

7    request ICS-Nett to provide, you know, the documents

8    responsive to the core set of RFPs that will identify --

9    because these are government -- this is government

10   equipment.

11          What ICS-Nett has said is, look, we can't

12   search these computers and we can't copy these computers,

13   so we don't have a non-incredibly burdensome way of

14   responding to your subpoena.  Can't we just give the

15   laptops back to the Government, the Government make

16   images and the Government produce to us the responsive

17   documents, which we thought made a lot of sense.  It's

18   sort of what we asked for and I think what Your Honor had

19   ruled in connection with the motion to compel.  So I

20   think it's essentially a subset of that issue as it sort

21   of evolved into that.

22          THE COURT:  All right.  So these are laptops

23   that existed -- they're currently being used, but they

24   existed in the 2012 to '15 time frame?

25          MR. TODOR:  They either existed or they have

4DD Holdings, LLC v. USA                                        10/4/2017

1   data on them that was from the -- earlier in 2012 to 2015

2   time frame.  That's just (inaudible) these laptops were

3   (inaudible) --

4           THE COURT:  The Government's position on that

5   is ICS-Nett, as the party that received the subpoena, has

6   the responsibility to identify responsive documents.

7   That might be one way for the Plaintiff to get at it, but

8   I view the Government's obligation to answer the

9   outstanding discovery request to be its primary concern

10  and perhaps we can kill two birds with one stone.

11          We don't have the issue, therefore, about

12  expired contracts or nonexistent laptops, right?

13          MR. TODOR:  For ICS-Nett, no, we hadn't raised

14  that, although we would note that Plaintiffs didn't raise

15  ICS-Nett in their motion to compel, so we weren't

16  briefing, you know --

17          THE COURT:  Right.

18          MR. TODOR:  -- the issue.  The contract -- the

19  Court already ruled whether the contract has expired

20  doesn't matter.

21          THE COURT:  Well, let's pretend they did.  Is

22  there any reason the Government can't ask for those

23  laptops to be copied and then produced?

24          MR. TODOR:  From a technical standpoint, I

25  don't think so.  I think there's a reason we couldn't do

4DD Holdings, LLC v. USA                          10/4/2017

1    it.  Our reason we responded the way we did on the JSR

2    was because the previous hearing, the Court had said ICS-

3    Nett -- the Court said, well, I think the Government

4    basically could review the contents of these laptops and

5    make the responsiveness and confidentiality calls, but

6    because Plaintiffs issued ICS-Nett a subpoena (inaudible)

7    that ICS-Nett, you know, should take the first crack on

8    it at least at this time.  That's -- but, you know, we

9    cite the Court's transcript.

10        If the Court would prefer for the Government to

11   make a copy of the entire contents of the laptops, which

12   it could, we have two problems.  One is ICS-Nett is

13   currently -- the same employees of ICS-nett are using

14   those laptops now on a separate project.  So if we were

15   to search using Plaintiff's set of search terms, which

16   are broad search terms, it would appear to be a good

17   likelihood that there will be documents that are not

18   relevant to the case that would come up with a search of

19   the entire contents of the laptop.

20        Someone will need to review the contents of,

21   you know, 12 laptops, a lot of data, to determine, one,

22   what's responsive to the Plaintiff's document request,

23   and two, whether there would need to be a restricted or

24   attorneys' eyes only designation made.

25        THE COURT:  Mm-hmm.

4DD Holdings, LLC v. USA                                    10/4/2017

1            MR. TODOR:  Our understanding was the Court had

2     ruled that ICS-Nett should be doing that as a first

3     instance rather than the Government and that was the

4     basis for our position.

5            THE COURT:  Well, if ICS is taking the position

6     that it cannot search these laptops --

7            MR. TODOR:  And my understanding is the reason

8     they said they couldn't search them is because the

9     Government had administrator privileges on the laptops,

10    but they didn't.  If the Government -- you know, so they

11    turn them in to the Government, DHA has represented, yes,

12    we can make a copy of these things that can be searched.

13    However, there's the question of who does the searching

14    once that happens.  Our proposal was ICS-Nett would

15    advance -- in advance, identify what the responsive

16    portions of the laptops would be, we'd copy those, and

17    then they can review them and produce them.

18            Another alternative would be ICS-Nett turns the

19    entire --

20            THE COURT:  Well, let's deal with that one

21    first.  How would they know what's responsive?

22            MR. TODOR:  They were served with a subpoena

23    from Plaintiffs, so that's what Plaintiffs wanted, which

24    were things like all things involving TETRA, as an

25    example.  The Plaintiffs gave them the subpoena.

4DD Holdings, LLC v. USA                                    10/4/2017

1          THE COURT:   Is there a way -- is there a way to
2     isolate that so that ICS-Nett is not willy-nilly copying
3     stuff that's either new or totally unrelated or maybe
4     proprietary to somebody else?
5          MR. MEYERS:   By copying, Your Honor, you mean
6     making copies of the data that's on their computer?   ICS-
7     Nett can't make copies of what's on those laptops.
8     That's part of the issue.
9          THE COURT:   Cannot?
10          MR. MEYERS:   Cannot.   They don't have the
11     technical rights to because it's government-furnished
12     equipment.   So they can't search it and they can't copy
13     it.   They need the Government --
14          THE COURT:   Well, now, hold on.   Are we talking
15     about a technical limitation or are we talking about a
16     permission limitation?
17          MR. MEYERS:   I think it's a permission
18     limitation that has been implemented technically and that
19     they -- you know, the software security prevents them
20     from --
21          THE COURT:   Well, hold on.   Is there a way past
22     that problem?
23          MR. TODOR:   The way that's been identified is
24     they -- ICS-Nett turns the laptop in to DHA, DHA has the
25     privileges so they can copy the whole contents of the

4DD Holdings, LLC v. USA                                    10/4/2017

1    laptop, and then that image can be searched.  That is my

2    understanding of how it can be done from a technical

3    standpoint.

4              THE COURT:  So I thought your door number one

5    was to have ICS respond to this, but it sounds like the

6    Government has to unlock the machine in order for that to

7    happen.

8              MR. TODOR:  Yes.  We have to unlock it.  The

9    question is who reads the contents of it -- well, first,

10   the question was, are we unlocking the whole thing or

11   just the portions ICS, looking at their file structure on

12   their hard drives, says, okay, this folder is responsive,

13   emails from this date range are responsive, those are the

14   ones you should copy, and then we'd only copy those

15   parts.

16             Option two is we copy the whole thing, but the

17   ICS-Nett reviews the whole thing to determine what's

18   responsive and what isn't.

19             THE COURT:  Because they're in a better

20   position?

21             MR. TODOR:  Because -- yes, and they would know

22   what they were working on.

23             THE COURT:  Well, I'm inclined to say whether

24   you take option one or two, whichever one makes sense,

25   whichever one happens faster.  But it seems to me both

1    are possible.  And if what's required is either an order

2    for me or permission from you saying, in effect, the

3    Court's directed us to do this, so you have permission to

4    copy this, give us a copy.

5            MR. TODOR:  Right.  My understanding from the

6    Court's previous order was that we were free to copy and

7    we had sent Plaintiffs here's basically the option one

8    that I described to you, here's what I think we should

9    do.  ICS -- please have ICS-Nett identify the parts,

10   bring me the laptops and we'll do it.  That hasn't

11   happened.

12           So if the Court contemplates -- you know, if

13   the Court is -- doesn't really care whether it's option

14   one or option two just so long as it gets done, we're

15   willing to do either.  Our main concern is we can -- I've

16   been told DHA can unlock the laptops and make a copy.

17   Someone has to review the contents of that copy before it

18   gets produced.  Our understanding from the Court's ruling

19   at the previous status conference was that when we unlock

20   the thing, that ICS-Nett will determine what's responsive

21   and what isn't.

22           THE COURT:  I assume I did that in response to

23   somebody's suggestion or request.  I don't care who

24   reviews it.  If the Government is in a position to answer

25   that question and say, these files are nonresponsive,

1   we're going to give Plaintiff access to these, I don't

2   care who does it.

3           MR. TODOR:  I understand that, Your Honor.  My

4   main concern here is that, you know, Plaintiffs obviously

5   have been quite aggressive in terms of, you know,

6   pursuing documents.  We're also trying to deal with a

7   wide range of document issues in response to the Court's

8   orders here, particularly given the timing and given the,

9   you know, 12 laptops contain a huge amount of material,

10  much of which -- you know, if they're working on other

11  projects, it's going to involve, you know, something

12  else, ICS-Nett would be in a better position to determine

13  what's responsive and what isn't than we would be.

14          THE COURT:  Fine, have them do it.  Like I

15  said, I don't care.  It seems to me that the question of

16  relevance is different than going page by page through

17  all the material there and saying it's relevant, but it's

18  protected for some reason.  I mean, that I can see it

19  taking a lot of time.

20          MR. TODOR:  Right.

21          THE COURT:  But if you're looking at just whole

22  groups of files and if obviously stuff is created after a

23  certain date or if it relates to software, the stuff ICS

24  has got going for the DHA that's totally unrelated, why

25  can't that be done sort of on a visual pass-through?

4DD Holdings, LLC v. USA                          10/4/2017

 1    This is the only stuff that appears to be related, copy

 2    it, and give it to the Plaintiff.

 3              MR. TODOR:  Well, I don't know how ICS-Nett had

 4    organized the files on those laptops, so I can't answer

 5    that question in the abstract.

 6              MR. MEYERS:  Your Honor, may I?  I'm sorry, I

 7    didn't mean to --

 8              THE COURT:  Go ahead.

 9              MR. MEYERS:  A couple things.  One, to clarify,

10    ICS-Nett was a contractor that we explicitly referenced

11    on our motion to compel the Government to produce

12    government contractor documents within the Government's

13    possession, custody or control.  We referenced them on

14    pages 2 and 3 of our motion.

15              Two, all of these issues underscore that the

16    Government is the one that has the contractual and

17    practical control over these documents.  ICS-Nett can't

18    run searches and can't copy these computers.

19              And, three, the Government essentially is --

20    seems to be farming out -- wants to farm out its party

21    discovery obligations to a nonparty.  ICS-Nett has

22    produced documents that are, I think, true third party

23    documents, as have others.  But what we've heard from a

24    lot of these contractors and what led us to file this

25    motion is these computers are the Government's computers.

```
 1    We returned these to the Government.  They're the ones
 2    that --
 3              THE COURT:  Well, these were not returned.
 4              MR. MEYERS:  They're not.  These ones --
 5    they're still working on them.  But they can't -- they
 6    can't search and copy the documents and, frankly, the
 7    Government is the one --
 8              THE COURT:  How can they use them if they can't
 9    search them?
10              MR. MEYERS:  I'm sorry?
11              THE COURT:  How can they use them if they can't
12    search them?
13              MR. MEYERS:  I don't -- I don't know.  I mean,
14    I'm just reporting what's been told to me and Mr. Todor
15    has seen the same in correspondence from the in-house
16    counsel at --
17              THE COURT:  All right, well, look, in two
18    weeks, what I would like to know is what the status of
19    this is.  I'm not saying that the production has to have
20    taken place, but I do want a solution to this little
21    problem.
22              MR. TODOR:  Understood, Your Honor.
23              THE COURT:  Okay.  Additional email custodians,
24    have we talked about that?
25              MR. MEYERS:  Yes, we have talked about that,
```

1    Your Honor.

2            THE COURT:  All right.

3            MR. TODOR:  Your Honor, with respect to that

4    issue, Plaintiffs haven't said like how many custodians

5    they're talking about.  In reference to the earlier

6    discussion involving subcontractor or contractor

7    employees, in terms of Plaintiff's issue they've raised

8    involving TST files and -- TST files and email,

9    particularly with respect to the employee that they've

10   raised, they wish to designate custodians to see whether

11   the Government has email searches on its servers for

12   those employees who are willing to do that in order to

13   produce whatever the Court feels we should be producing

14   with respect to subcontractors even though, you know, we

15   previously made the preservation order to them.

16           THE COURT:  So what you need is the names?

17           MR. TODOR:  Yes.

18           MR. MEYERS:  We'll get him those names.

19           THE COURT:  Okay.

20           MR. MEYERS:  This week, today, tomorrow.

21           THE COURT:  Attorneys' eyes only, was that --

22   as I understand it, there's a fair number of documents

23   that are attorneys' eyes only.  Unless you're at a point

24   in your manipulating or using that information that makes

25   it too awkward because you can't discuss it with your

4DD Holdings, LLC v. USA                              10/4/2017

1    client, I'm inclined to wait on resolving that.  But in

2    order to resolve it, what I would propose to do later,

3    not now, is a random sample of those documents and have

4    me look at them and see why they're being labeled as

5    attorneys' eyes only.  But we can do that later.

6              MR. TODOR:  Understood, Your Honor.  We also --

7    we are considering Plaintiff's proposal -- Plaintiffs

8    initially proposed, you know, one employee of their

9    client to be able to review the attorneys' eyes only as a

10   way of getting around it.  That person's title is chief

11   strategy officer, so, you know, the things are about, you

12   know, what the Government's acquisition plans are that

13   some of these officials may have, we don't think a

14   strategy officer should have --

15             THE COURT:  A fox in the henhouse?

16             MR. TODOR:  If they point me to individual

17   documents they don't think that -- you know, we're more

18   than willing to consider it.  If they identify ones they

19   think ought not to have that designation, you know, we'll

20   deal with that per the protective order.  We think it's a

21   reasonable suggestion from the Court to deal with that

22   issue somewhat later as depositions approach.

23             THE COURT:  Okay.  What else is hanging fire?

24   It seems like I've got to do something else.

25             MR. TODOR:  The Court has instructed the

4DD Holdings, LLC v. USA                                        10/4/2017

1    Government to go to these third parties to turn over what

2    the -- is called for by the contract.  The Court had

3    raised the issue of whether that would include basically

4    the full scope of Plaintiff's document requests, what is

5    designed in the contract that might be over or under-

6    inclusive compared to Plaintiff's document requests, or a

7    subset of Plaintiff's document requests.  Does the Court

8    have any further guidance on that question?

9            THE COURT:  Well, I thought that Plaintiff's

10   counsel said they would be willing to work with you on

11   being specific in terms of what they think is within the

12   contract.  And so I'm assuming that -- I was trying to

13   avoid characterizing it myself.  Did I make that offer or

14   did you all make that offer?

15           MR. O'BEIRNE:  We did, Your Honor.  We

16   understood you to accept that we would meet and confer.

17           THE COURT:  Okay.  That's probably about a

18   fourth reason that -- let's reconvene in a couple of

19   weeks by telephone.

20           Go ahead.

21           MR. TODOR:  I'd just like to try to run down to

22   make sure I understand what it is that the Court needs us

23   to confer on or instruct everyone to do before we

24   reconvene in two weeks.  Would that be possible?

25           THE COURT:  That's a great idea.  I'm not --

4DD Holdings, LLC v. USA                          10/4/2017

1    I'm probably not going to be able to help you, but --

2              MR. TODOR:  So first, I have the Government is

3    to meet and confer with Plaintiffs and to reach out to

4    the third party prime contractors, which would be within

5    the scope of Plaintiff's motion to compel to have them

6    produce to the Government documents that would have been

7    under those contracts to produce.

8              THE COURT:  Despite the fact that they're

9    closed contracts, right?

10             MR. TODOR:  Right, notwithstanding that.

11             THE COURT:  Okay.

12             MR. TODOR:  My understanding is the Court's

13   order would speak to that issue, which might be

14   helpful -- for example, Deloitte, in its letter that they

15   sent to Plaintiffs says, well, we have no responsive

16   documents and here's 22 separate objections we have to

17   your subpoena anyway.  If the Court is putting the --

18   basically the Government in the position of being the

19   document collector, it may be helpful --

20             THE COURT:  Okay.

21             MR. TODOR:  -- in terms of dealing with the

22   third parties to have a court order that we are

23   instructed to do that.

24             THE COURT:  All right.

25             MR. TODOR:  Second, on the 30(b)(6) deposition,

4DD Holdings, LLC v. USA                                    10/4/2017

1    was to be on record management questions and that the

2    Plaintiffs were preparing a notice for that and that the

3    Government was to identify witnesses to testify to that.

4    My understanding at this time is that it may not be one

5    person because it may need to be one person from the

6    Rosslyn and one person from the San Antonio facilities.

7               THE COURT:  Right.  And it may have to happen

8    more than once given the fact that I'm allowing it to

9    occur before document production is complete.

10              MR. TODOR:  Okay.  Does the Court have a

11   preference in terms of time frame for that to be

12   accomplished?

13              THE COURT:  Well, like tomorrow, but that's not

14   going to work.  I don't know.  I'm assuming that you all

15   are going to have to have a fair number of conversations

16   in the next couple of days.  I will just leave that with

17   you folks.  I would like to see that happen sooner rather

18   than later.  I believe what I said when we were talking

19   about this, that I wasn't -- I was going to suggest that

20   that happen before that narrowed production of emails

21   occurred.

22              MR. TODOR:  Okay.  That was to be my next

23   question.  The email productions, there was the October

24   13th deadline that was sent by the Court.

25              THE COURT:  Mm-hmm.

4DD Holdings, LLC v. USA                          10/4/2017

```
 1                    MR. TODOR:  My understanding is --

 2                    THE COURT:  Was that in print?

 3                    MR. TODOR:  It was in the Court's order of, I

 4       think, September 11th.

 5                    THE COURT:  Okay.

 6                    MR. TODOR:  My understanding from what the

 7       Court said today is that the Government was to prioritize

 8       preparation for the 30(b)(6) deposition and whether our

 9       IT contractors, who are also the ones working on the

10       emails, are able to access the DTC server copy hard

11       drives before the email search, but we're to proceed as

12       expeditiously as we could on all three fronts.

13                    THE COURT:  Yes.  Although I think what I said

14       was that -- you said there were three tranches of

15       potential email sources of material there.

16                    MR. TODOR:  Yes.

17                    THE COURT:  And you said one looked more likely

18       to be fruitful than the rest.

19                    MR. TODOR:  Yes.

20                    THE COURT:  And I'm assuming in the next two

21       weeks that the three -- four of you, whatever number of

22       you, will have negotiated a narrowed down search list and

23       you'll have some idea by then what that's going to

24       produce.

25                    MR. TODOR:  Understood, Your Honor.
```

 1            THE COURT:  Okay?

 2            MR. TODOR:  Okay, so for the DHA Legacy

 3    tranche.

 4            MR. MEYERS:  We expect to do that, yes, Your

 5    Honor.

 6            THE COURT:  Mm-hmm.

 7            MR. O'BEIRNE:  And, Your Honor, we're willing

 8    to work simultaneously with the Government on all these

 9    issues, getting them the updated terms, the discussions

10    on the 30(b)(6), et cetera.

11            THE COURT:  Right, I would assume that you all

12    can multitask even though perhaps some of the data

13    gatherers won't be able to.

14            MR. TODOR:  Okay.  And then on the DTC hard

15    drives, we are to prioritize whether we, the Government,

16    are able to access them and to coordinate whatever we

17    need to do in terms of both the contracting officers and

18    ICS-Nett to determine how the parties can access those

19    hard drives.

20            THE COURT:  This is that batch that went off to

21    West Virginia?

22            MR. TODOR:  Yes, or that were used to transfer

23    things to West Virginia, yes.

24            THE COURT:  Right.  And, again, that's -- that

25    doesn't seem unreasonable since it's -- in effect, you're

4DD Holdings, LLC v. USA                                    10/4/2017

1    asking a different set of people to confirm the code,

2    that it's accessible.

3              MR. TODOR:  Okay.

4              THE COURT:  All right.

5              MR. TODOR:  And on the ICS-Nett drives, DHA is

6    to basically unlock and create the images and arrange for

7    the files to be in a condition to where they can be

8    reviewed for responsiveness by ICS.

9              THE COURT:  Again, I don't care whether you do

10   it or ICS does it as long as it gets done.  And -- right.

11             MR. TODOR:  Okay.

12             THE COURT:  Is that it?  I keep hoping for some

13   indication that the game is worth the candle.  This is

14   nothing more than an observation, but you folks are

15   spending an enormous amount of effort and presumably

16   money.  I just hope that it's worth the effort.

17             The other thing I was going to raise with you

18   is the -- I think I brought this out last time and I

19   don't remember actually resolving it.  But would it be

20   useful for the parties if I denied, without prejudice,

21   the motion to dismiss?

22             MR. MEYERS:  We think it would be, Your Honor,

23   yes.

24             THE COURT:  Hmm?

25             MR. TODOR:  Well, we haven't withdrawn the

```
 1   motion, so, no, we don't.  That's not our position that
 2   the Court -- that the motion should be denied.
 3            MR. MEYERS:  It's driving an artificial
 4   schedule problem because the -- we can get all of this
 5   done by the April 1st deadline for all fact discovery.
 6   I'm confident that we can.  And so it's a question of the
 7   discovery (inaudible) documents and the depositions that
 8   would go to the issue of the motion, which is currently
 9   set -- that cut-off is currently December 1st.
10            And so if the Government wants to renew -- you
11   know, file a summary judgment motion after, you know, the
12   normal sequence of events, we're done with discovery,
13   we've got facts, we've got experts, and they say, all
14   right, you know, we want to get rid of part of the case,
15   file summary judgment -- partial summary judgment.  That
16   would be, I think, one approach.
17            THE COURT:  Well, I think Mr. Todor's point is
18   that, absent putting something in front of me that
19   suggests that there's some -- that I can't grant the
20   motion in full, even if it's a partial motion, probably
21   I'm limited to merely postponing your response to it.
22   But I don't mind.  Have I put in an order that December
23   cut-off date for discovery related to authority?
24            MR. MEYERS:  Yes.
25            MR. O'BEIRNE:  The current scheduling order has
```

4DD Holdings, LLC v. USA                                    10/4/2017

1     December 1st as the cut-off of jurisdictional -- of

2     authorization, consent and discovery, jurisdictional

3     discovery.

4            MR. MEYERS:  And I think our opposition to the

5     motion is due January 3rd.

6            MR. O'BEIRNE:  January 3rd.

7            THE COURT:  Ah.  Well, I guess my thought is

8     that I would simply postpone the -- link up discovery

9     generally with discovery on authority and postpone your

10    obligation to respond until after whatever the April

11    deadline is.

12           MR. TODOR:  Your Honor, if the Court wishes to

13    defer its consideration of the motion to dismiss, that's

14    the Court's prerogative.  That would tie up somewhat in

15    the issue of the SMS production.  SMS is one of the

16    contractors that Plaintiffs are seeking documents from in

17    the motion to compel.

18           THE COURT:  Mm-hmm.

19           MR. TODOR:  In our response, we had noted that

20    SMS had only produced documents that were pertinent to

21    the jurisdictional discovery issues it said at the --

22    when Plaintiffs had filed the motion to compel that the

23    Court denied this May.

24           THE COURT:  Mm-hmm.

25           MR. TODOR:  If the Court is changing the

4DD Holdings, LLC v. USA                                          10/4/2017

1   discovery plan such that there would be no limitation on

2   the discovery to only being on the authorization and

3   consent question, and that all discovery would proceed

4   until the April 2nd deadline because the Court was

5   deferring consideration of our motion to dismiss, that

6   may change the scope of things in terms of what SMS's

7   production may be.

8           It may also simplify matters in terms of our --

9   since the Court has ordered us to request SMS's contract

10  files basically pertinent to this case, SMS had earlier

11  resisted Plaintiff's subpoena and motion to compel

12  saying, well, all we're under an obligation to do is give

13  things on authorization and consent.  If it is the

14  Court's intent to alter that, it would probably be

15  productive to place that in the Court's order so as to

16  clarify matters when we go to SMS.

17          THE COURT:  Okay.  I'll do that.

18          MR. MEYERS:  We would agree with that.

19          Your Honor, may I ask one point?  On our

20  opposition to the motion to dismiss, my clients may

21  decide, after we get the documents and maybe some of the

22  depositions, that they'd like a resolution of that issue

23  earlier rather than later to try and narrow the issues in

24  this case and figure out, as you've said, what is at

25  stake and what isn't.  And so I guess we would like at

4DD Holdings, LLC v. USA                                    10/4/2017

```
1   least the ability to file a motion -- or opposition
2   earlier, but not necessarily be required to.  In other
3   words --
4          THE COURT:  Right.  Well, that would -- I don't
5   have any problem with that.  And we can talk about the
6   Government's obligation to reply at that point.
7          MR. MEYERS:  Sure.  We would work with the
8   Government on a briefing schedule if we decide that we
9   can file it in January or February rather than waiting
10  until April of May.
11         THE COURT:  Mm-hmm, right.
12         MR. MEYERS:  I think all the parties would
13  probably be interested in a resolution sooner rather than
14  later if it's on the appropriate record.
15         THE COURT:  On a sufficient record, although
16  that may only ratchet in one direction.  Well, of course,
17  the motion only runs in one direction.
18         Okay, anything else?
19         MR. TODOR:  I think those were the listing of
20  issues that were pending.  With respect to the motion, as
21  the Court notes, if the Court is altering the discovery
22  plan -- I mean, one of the purposes of the motion to
23  dismiss was to narrow the issues for discovery, since the
24  Court apparently is saying, well, the Court's not
25  narrowing the issues for discovery, then Plaintiffs may
```

```
 1    desire to move.  But I don't know that it would change
 2    what the parties would really be doing in terms of
 3    discovery no matter when the Court were to receive
 4    briefing or to decide that motion, although we certainly
 5    agree to be resolved prior to any -- you know, certainly
 6    at the end of discovery, the issues should be dissolved
 7    so the parties know what the issues that remain in the
 8    case are.
 9              THE COURT:  I'm not exactly sure what you're
10    suggesting.
11              MR. TODOR:  Plaintiffs have said they might
12    want to file their response early.
13              THE COURT:  Right.
14              MR. TODOR:  We're not sure that would do much
15    in terms of narrowing the issues for discovery because
16    the Court has said, well, the Court's not going to narrow
17    the issues for discovery --
18              THE COURT:  Oh, I don't think that's the
19    purpose of it.  I think the purpose of it is to eliminate
20    some of the ambiguity in the lawsuit.  In other words, I
21    think --I'm assuming that if the Plaintiffs are correct,
22    it would be sufficient to meet the motion to say that
23    there's some evidence that the Government was aware
24    beyond whatever it's conceded already in terms of
25    authorization.  That would be enough to deny the motion,
```

4DD Holdings, LLC v. USA                                    10/4/2017

1    right?

2             MR. MEYERS:  We certainly think that and

3    we have definitely seen that in the documents, Your

4    Honor.

5             THE COURT:  Right.  So, I mean, I don't think

6    it would have any impact one way or the other on

7    discovery.  You'd still have to go through the drill

8    largely.  The reason I thought initially that segregating

9    discovery might be useful is because I thought

10   authorization and consent could be teased out as sort of

11   a separate proof.  It's obvious to me that it's just

12   wrapped around the axle with general discovery and

13   damages or use -- extent of use, that kind of thing.  So

14   I don't see there's much to be gained by maintaining that

15   segregation of discovery.

16             I tell you what I may do -- normally, I don't

17   do this, but what we may do is email you a draft of the

18   scheduling order to make sure that I've covered what you

19   think we've discussed today.  And if you have any

20   suggestions, I'm not looking for tweaking on

21   irrelevancies, but just to make sure that I'm capturing

22   what I think I've told you folks.

23             MR. MEYERS:  That's all we have, Your Honor.

24             THE COURT:  Okay.

25             MR. TODOR:  That's it, Your Honor.

93

4DD Holdings, LLC v. USA                                    10/4/2017

```
 1              THE COURT:  Thank you.  We're adjourned.
 2              (Whereupon, at 3:49 p.m., the hearing was
 3   adjourned.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

94

4DD Holdings, LLC v. USA                          10/4/2017

```
 1              CERTIFICATE OF TRANSCRIBER

 2

 3          I, Elizabeth M. Farrell, court-approved

 4   transcriber, certify that the foregoing is a correct

 5   transcript from the official electronic sound recording

 6   of the proceedings in the above-titled matter.

 7

 8

 9

10   DATE: 10/13/2017              S/Elizabeth M. Farrell

11                                 ELIZABETH M. FARRELL, CERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```